## Case No. 13,019.

### SMITH v. BURNHAM.

[3 Sumn. 435.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1838.

PARTNERSHIP—EVIDENCE TO ESTABLISH—SPECIFIC PERFORMANCE—STATUTE OF FRAUDS.

1. The evidence in the present case was *held* to be too loose and general in its texture, to establish the case, stated in the bill, of a general copartnership in land and lumber speculations in Maine.

2. Evidence by confessions, especially where it goes to the whole merits of the case, is open to much objection.

[Cited in Borland v. Zittlosen, 27 Fed. 134.]

3. A court of equity will not interfere to direct a specific performance of an agreement, where the terms of the contract are not definite and full, and its nature and extent are not made out by clear and unambiguous proofs.

[Cited in Brown v. Brown, 47 Mich. 385, 11 N. W. 205. Cited in brief in Brown v. Volkening, 64 N. Y. 78. Cited in Perry v. McHenry, 13 Ill. 233. Cited in brief in Pinnock v. Clough, 16 Vt. 504. Cited in Shaffer v. Fetty, 30 W. Va. 257, 4 S. E. 278; Wheeler v. Reynolds, 66 N. Y. 235; Whiting v. Gould, 2 Wis. 590.]

4. A promissory note on interest cannot be treated as a mere memorandum of an advance for a purchase upon a copartnership account.

5. A parol agreement, to become copartners in the business of purchasing and selling lands and lumber in the state of Maine, is a parol contract respecting an interest in lands, and

void by the statute of frauds, so that it will not be enforced by a court of equity.

[Cited in Re Warren, Case No. 17,191; Re Farmer, Id. 4,650; Young v. Wheeler, 34 Fed. 99.]

[Cited in Bailey v. Hemenway, 147 Mass. 328, 17 N. E. 645; Barker v. Wainwright, 36 Md. 353. Disapproved in Bates v. Babcock, 95 Cal. 484, 30 Pac. 605. Cited in Bird v. Morrison, 12 Wis. 156; Burden v. Sheridan, 36 Iowa, 130; Chester v. Dickerson, 54 N. Y. 7. Disapproved in Holmes v. McCray, 51 Ind. 363. Cited in brief in Kilbourn v. Latta, 5 Mackey, 305. Cited in Parsons v. Phelan, 134 Mass. 109; Perry v. McHenry, 13 Ill. 236; Printup v. Mitchell, 17 Ga. 558; Richards v. Grinnell, 63 Iowa, 53, 18 N. W. 668. Distinguished in Trowbridge v. Wetherbee, 93 Mass. (11 Allen) 364.]

6. The bill did not state, in what state the parol agreement for copartnership was actually made, though it might be taken from the allegations to have been made either in Massachusetts, Maine, or New Hampshire. Semble, that this would be a fatal omission, if properly presented to the court.

[7. Cited in Richards v. Richards, 9 Gray, 315, to the point that equitable as well as legal interests in land are embraced in the statute of frauds.]

Bill in equity [by Frederick Smith against Daniel Burnham]. This case had already been before the court on an interlocutory matter. [Case No. 13,018.] The bill stated, that "about the first of June, 1834, the plaintiff and the defendant entered into an agreement, to become copartners in the business of purchasing and selling lands and lumber in the state of Maine," upon a joint capital, to be furnished by both, and the profits and losses to be equally shared between them. The bill then proceeded to state, that certain purchases and sales of land and lumber (enumerating them), were made by the defendant, in pursuance of the agreement, and that certain advances of money were made by the plaintiff to the defendant, on the same account. It called for an account of all the dealings and affairs of the copartnership; and then prayed, that the copartnership might be dissolved, and that, if any of the purchased lands remained unsold, the defendant might be decreed to convey to the plaintiff his just and equitable share; and for further relief. The answer denied the existence of any such agreement of copartnership, and that any purchases were ever made in pursuance thereof; and that any advances of money were ever made by the plaintiff, as asserted in the bill. And it proceeded to answer, in full terms, all the allegations of the bill, and all the merits thereof, and also relied upon the statute of frauds, as a full defence to such pretended agreement.

B. Rand, for plaintiff.

C. P. & B. R. Curtis, for defendant.

STORY, Circuit Justice. The main questions in the cause are, (1) in the first place, whether there was an agreement of general copartnership; (2) in the next place, whether any such advances or purchases were ever

made in pursuance thereof, as are charged in the bill; (3) and, in the next place, whether, if there was any such agreement, it not being pretended to be in writing, but merely by parol, it is not utterly void within the statute of frauds. To enable the plaintiff to maintain his suit, it is indispensable that he should make out the affirmative upon each of these points; that there was such a copartnership; that such advances and purchases were made; and that the agreement is not within the statute of frauds. The answer having positively denied the two former, as matters of fact, and the denials being responsive to the allegations of the bill, it follows, of course, that it is incumbent upon the plaintiff, by competent and satisfactory evidence, to overcome the answer, and falsify its statements by two witnesses, or by one witness and other equivalent proofs, or it must stand for verity. It will not be sufficient, that some of its statements may be brought into doubt. They must all be positively overcome, so far at least as the merits of the controversy are concerned. And, first, as to the existence of the agreement of copartnership. And, here, it is most material to remark, that there is not a single scrap of paper in the cause between the parties, alluding to, or in any manner whatsoever touching, the matter of such copartnership. Although, as the allegations of the bill show, large operations in the purchase and sales of land were contemplated, and large advances might from time to time be required to meet the exigencies of such a business, and entire confidence must have existed between the parties, not a single letter is produced, which alludes to any negotiations or speculations or advances. The absence of all such documents, in a case of this sort, during the whole period of the supposed operations of the partnership, is certainly an awakening circumstance, difficult to account for in a satisfactory manner, if the agreement be real; but of easy and natural explanation, if it be a mere figment, or an unexecuted proposal. In the next place, there is no exact proof of the agreement—its terms, its nature, its extent, its duration, or its objects—from any witness present, when it was formed. All, that we know about it, is derived from after conversations and loose confessions of the defendant, testified to by certain witnesses, which conversations and confessions, if entirely confided in, still leave the nature and terms of the agreement so loose and indefinite, that it is utterly impossible to ascertain its exact and full import in all respects, so as to enable a court of equity to execute it with a confidence that it understood the whole intentions of the parties. For example, in what proportions were the parties to be interested, and to supply funds? To what purchases was the copartnership to extend? To all purchases of land or timber made by either of them respectively, or to those only made on joint account? If the latter, how were the purchases to be ascer-

tained, and, as it were, ear-marked? What was to be the duration of the partnership? During pleasure, or life, or for a limited period? All these are questions, which must be answered with definite exactness and clearness before the court could make a satisfactory decree; and yet, looking to the whole evidence, it is scarcely possible to find sufficient materials for satisfactory answers to them; or, at least, for such answers as a court of equity might rely on with undoubting confidence. And then, again, the whole substance of the case is to be made out, as has been already intimated, by confessions. Now, evidence of this sort, especially where it goes to the whole merits of the case, is certainly open to much objection. It was well remarked, by Sir William Grant, in Lench v. Lench, 10 Ves. 518, where an attempt was made to establish, by parol declarations and confessions of a party, a trust in real estate, that "it is in all cases most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides; the slightest mistake or failure of recollection may totally alter the effect of the declaration." He added, in reference to the case before him, what is equally true in the case before us, that "there are no corroborating circumstances by any writing under his (the party's) hand. In most of the cases there has been at least something in writing, some account by which it appeared that the fund was laid out. This case has not the circumstance, considered of weight in other cases, the inability of the defendant to make the purchase with other funds." Indeed, it is scarcely possible to avoid feeling, that this language meets the very difficulties of the present case. Here there is no writing, no account, no proof of the funds of the plaintiff being actually laid out in any lands, and no proof of inability of the defendant to make the purchases, which he did make, without the money or credit of the plaintiff to aid him.

I have read over the whole evidence in this case; and although there is much from the confessions of the defendant, which, if it stood alone, might lead one to the conclusion, that there was some sort of partnership, or joint interest, intended by the parties, in certain purchases, made or to be made of lands and lumber in Maine; yet I am not entirely satisfied, that it is so definite and satisfactory, as to its nature or extent, or the proportions of the parties, as would lead a court of equity to enforce it; for it is a general rule of such courts, not to interfere to direct a specific performance of any agreement, where the terms of the contract are not all definite and full, and its nature and extent are not made out by clear and unambiguous proofs. See 2 Story, Eq. Jur. §§ 751, 764, 767, and the cases there cited. But the countervailing proofs, on the part of the defendant, do certainly throw great doubts and uncertainties over the proofs on the other side, and lead us to the conclusion, that there may have been

some mistakes and misapprehensions, to say the least, on the part of the plaintiff's witnesses, as to the purport and effect of the conversations of the defendant, to which they testify.

But, if this difficulty could be overcome, there are other considerations of very grave importance, touching the next point, namely, of the advances, made by the plaintiff on account of the asserted copartnership; and, if such advances were made, of the actual investment of such advance moneys in any lands or timber on account of the asserted copartnership. Upon this subject, the bill states, that about the 20th of June, 1834, the plaintiff and defendant, being in the state of Maine, for the purpose of prosecuting the business of the copartnership, purchased of one Babbitt, at Bangor, "one undivided moiety of a large quantity of logs or timber, for the sum of thirty-five hundred dollars, or thereabouts"; and the other undivided moiety was at the same time purchased of Babbitt by one Robert M. N. Smith, for the like sum of thirty-five hundred dollars, or thereabouts; and by the terms of the sale, a credit was to be given for some part of the purchase-money (but for what part the credit was to be given, the bill does not state); and thereupon it was agreed, that Smith should have the management and control of the timber, and sell the same, and account with the plaintiff and defendant for their moiety thereof; that the plaintiff then advanced to the defendant on account of the purchase, and for his share of the money then to be paid, the sum of one thousand dollars, or thereabouts; that, afterwards, about the first of January, 1835, Smith accounted with the defendant for the proceeds of some part of the sales of the timber, and paid to the defendant the sum of two thousand dollars on account of the plaintiff and defendant, and thereupon the plaintiff directed the defendant to retain the same, to be paid on account of certain lands, purchased on joint account, of one Black, and which will be hereafter mentioned.

The bill then states, that, in further prosecution of the copartnership, the plaintiff and defendant, about the first of October, 1834, contracted with one Packard, that he should convey to the plaintiff, or his assigns, a certain tract of land in Maine, and thereupon Packard executed and delivered to the plaintiff his bond, conditioned to convey the land to the plaintiff, or his assigns, upon the making of certain payments by the plaintiff, or his assigns; that about the first of December, 1834, the plaintiff delivered the said bond to the defendant, to enable the latter to comply with the conditions, and obtain a conveyance of the land; that the defendant, instead of so doing, gave up the bond to Packard to be cancelled, alleging that it was not for the benefit of the copartnership to receive a conveyance. The bill then states, that about the 12th of December, 1834, it was ascertained,

that one Black, in his own right, as agent or trustee, was desirous of selling several townships of land in Maine, and that one David Webster was ready and willing to purchase one undivided moiety thereof, and thereupon the plaintiff and defendant agreed, that their copartnership should purchase the other moiety thereof; and that the defendant should proceed without delay to make a contract with Black for the sale and conveyance thereof; and that the sum of one thousand dollars retained by the defendant should go and be applied by the defendant, in and towards the first cash payment for the sale and conveyance of the said moiety by Black; and that, if the defendant should want more money for the purpose, he should give notice thereof to the plaintiff, who was to assist him in raising the requisite funds. The bill then states, that the defendant accordingly contracted with Black for the one moiety of nine and one half townships of land; and Webster contracted for the other moiety thereof; that the defendant then paid Black the sum of one thousand dollars, and no more, toward the purchase money, and to bind the bargain; and that the contract in writing of Black, for such sale and conveyance thereof, was, by agreement between defendant and Webster, to run to them both, to convey the whole lands to them, of which Webster was to be the owner of one moiety, and the defendant of the other; but whether Webster then knew, that the purchase was then made by Burnham for the benefit of the copartnership, the bill alleges the plaintiff to be ignorant. The bill then states, that Black executed the contract in writing accordingly. The bill then alleges, that the plaintiff and defendant afterwards, jointly and separately, offered the interest of the copartnership in the said townships for sale, and endeavored to effect a sale thereof; and that the defendant constantly spoke of the interest in the said lands as belonging to the copartnership, and spoke of, and recognized, and treated the said plaintiff, as having an equal and copartnership right therein. The bill then states, that afterwards, about the 12th of February, 1835, the time approaching, when another payment would become due to Black, the plaintiff made a further advance of four thousand and four hundred dollars to the defendant, to be applied towards such payment to Black. That soon afterwards the defendant sold the interest of the copartnership in seven and one half of the said township, at a great profit; that the plaintiff was ready to have made any further advances on account of the copartnership, to enable the defendant to comply with his contract with Black, and had actually deposited in a bank at Bangor for the purpose the sum of five thousand dollars, to his own credit; but the defendant never asked for any further advances; and the plaintiff understood that Black did not exact strict payment, so that no more money was wanted. The credit was

accordingly extended; and payment was subsequently made, by means of the proceeds of the sales of the copartnership interest in the lands aforesaid, of all the sums due to Black under the contract, and that the defendant has sold the interest of the copartnership in the remaining portion of the land, and realized therefrom a large profit, amounting to forty thousand dollars.

These are all the specifications in the bill of any advances, for investments made under the asserted copartnership. As to the purchase of Babbitt, the answer gives a very different account of it from what is stated in the bill. It positively denies that there was ever any such copartnership interest therein; and as positively denies, that the plaintiff ever advanced the sum of one thousand dollars, or any other sum, to the defendant, as the plaintiff's share of moneys to be paid for the logs. On the contrary, the answer asserts, that on the 23d of July, 1834, the plaintiff lent one thousand and ten dollars to the defendant, and took the defendant's promissory note therefor, payable on demand, with interest. The bill admits the giving of this note, and insists, that it was taken and preserved as a memorandum of the amount and time of such advance, and that this is a customary mode of doing business in like cases. A copy of this note is annexed to the bill, and it is for the payment of one thousand and ten dollars, to the plaintiff, or order, on demand, with interest. Now, no satisfactory proof has been offered in this case, that in transactions of this nature notes in such a form are ever given as mere memorandums of advances. That notes should be given in such cases, payable on demand, would seem to be sufficiently singular, and so inexpressive of the real intent of the parties, as to excite some doubt whether it could be a usual course of business. But that such notes should be given, payable with interest, would seem to be utterly repugnant to all notions of propriety in the conduct of such business. Prima facie, such notes must be presumed to import a present absolute indebtment of money, for which interest is to be paid. And to allow parol evidence to shew, that such was not the intention of the parties would be, not only to vary, but to contradict, the very words of the instrument. It appears to me, that this very note is written evidence directly contradicting the allegations of the bill, that there was an advance of one thousand dollars on copartnership account, towards the purchase of the timber from Babbitt. I know not, indeed, where a court of equity could stop, if it could, under such circumstances as are presented in the present case, allow such a note to be treated as a mere memorandum of an advance, for a purchase upon a copartnership account. The defendant has, in his answer, also, expressly denied, that he has ever received from Smith any moneys or notes, on account of the timber, beyond the moneys which he had ad-

vanced without any interest therefor. But, as the case made by the bill is met by such direct denials of the copartnership, and of the advance of the one thousand dollars on account thereof, and is unsupported by any sufficient evidence, the question of such advance may be dismissed from any further consideration. The testimony of R. M. N. Smith, who is principally relied on to establish this part of the plaintiff's case, is to the following effect: That he saw the plaintiff and Burnham, at Bangor, in the summer and fall of 1834; that they were there for the purpose of speculation in lands and other matters. That he was employed by them to use his influence and information for getting bonds for lands for them; and was to receive, for his compensation, half of the profits made on the sale of such bonds, and the plaintiff and Burnham were to share the other half, equally, between them. That both the plaintiff and Burnham stated to him that they were jointly and equally interested in any speculations they should make. That they jointly with him purchased a lot of logs of Babbitt, in the early part of the summer of 1834; his interest to be one half and that of the plaintiff and Burnham, the other half, jointly and equally, between them. The plaintiff did not make any advance of money for the purchase of the logs; but it was to be made, and was made by Burnham. That when the bargain was closed the plaintiff offered to go and get a sum of money to pay, and Burnham told him he had money enough in his pocket-book to pay what was required; and that the plaintiff and he could settle afterwards; and Burnham accordingly paid the advance money, about two thousand dollars. The witness gave to Burnham two notes, or receipts, to account for the advance, which were afterwards returned to him by Burnham, on a settlement in the following autumn. The witness was to take the lumber, and saw it up, and sell it, and then he was to have half the profits, and the plaintiff and Burnham the other half. On the settlement he paid the whole advance of two thousand dollars; but no more is stated by him to have been paid to Burnham. That in December, 1834, he saw Burnham at Bangor. Soon after he and Burnham, and Colonel Webster, went to see Black at Ellsworth, and there Burnham and Webster concluded a bargain for the lands with Black. That the witness had no interest to the purchase; but that Burnham told him, that "Webster was to have one half, and the plaintiff and himself the other half together, they being jointly and equally interested in any purchases of land;" adding, that the plaintiff's capital was not large, but his credit was good, and that they could make out their parts of the payment well enough. The witness added that "in various conversations Burnham told him, that he and the plaintiff were equally and jointly concerned in any operations to be made by either."

Now, giving the fullest effect to this testimony, as to the Babbitt purchase, we see, that even Smith, the co-purchaser of the logs, does not pretend, that he ever knew of any such advance made by the plaintiff to the defendant, on account of the logs. On the contrary, he admits, that the whole money (two thousand dollars) was paid by the defendant, out of his own funds; and if afterwards the plaintiff had repaid to the defendant his share of such advance, the note already alluded to could not have been given to the plaintiff in that account, but would seem to be utterly irreconcilable with the very nature of such a transaction. It is remarkable, too, that Smith confirms the answer, as to his repayment of the money to the defendant, which was advanced to him; and he does not even pretend, that in his settlement with the defendant he ever paid him a cent beyond that advance. So far, then, as the Babbitt transaction goes, no case is made out in evidence, which shews, that the defendant has ever received any money beyond his advance from Smith on joint or co-partnership account; and consequently the bill on this point is not maintained. Indeed, it is not averred in the bill, that any profits were in fact made thereon. It should be added, that if this objection were not decisive, it would be impossible for the court to maintain jurisdiction, to decree an account of this matter without Smith being made a direct party to the bill, as the proper and ultimate accounting party. I have not thought it necessary to comment at large upon the bearing of Smith's testimony as to the Babbitt transaction and purchase, and the joint interest of the plaintiff and defendant therein, or as to the purchase from Black on their joint account. It certainly is, in some particulars, strong and direct to the purpose. But it consists wholly of asserted confessions of the defendant, and does not satisfactorily establish any general copartnership, such as is charged in the bill, between the plaintiff and the defendant, whatever might be its force as to a joint interest in the Babbitt purchase, or the Black purchase. Similar remarks are applicable to the testimony of Woodman as to the Babbitt purchase. He testifies to conversations of the defendant of a very general nature, and in very general terms, in the autumn of 1834, in the latter part of September, or the beginning of October, to this effect; that the plaintiff had gone into land speculations with him; that he and the plaintiff had purchased logs, on which they had made. or should make, sixteen hundred dollars; that they had made a large purchase of lands, or had the refusal of a number of townships; that they should make on lands a large sum. say eighty thousand dollars; and that in the whole conversation the defendant used the word "we," coupling himself and the plaintiff together, though he did not use the word partner, partnership, or joint interest. Now it is impossi-

ble not to perceive, how very loose and unsatisfactory such statements are to found any satisfactory proofs of a definite fixed copartnership. It is also to be remembered, that though this conversation was long after the Babbitt purchase, yet it was long before the purchase of Black; so that, as to the latter, nothing more could have been contemplated, giving the fullest effect to the language, than future speculations in those lands on joint account. The testimony of Pearson Cogswell, as to the purchase of the lumber, is equally loose and unsatisfactory. All that he says is, that some time previous to December, 1834, on board of a steam-boat, Burnham said to him, "I," or "Frederick Smith and I, have let Robert M. N. Smith have money to purchase lumber." In respect to the purchase from Black, he is more full; but still very general. He states in effect, that in various conversations with him Burnham acknowledged, that the purchase from Black was made (with Webster). on the joint account of himself and the plaintiff; that he and the plaintiff were in partnership in purchasing the bond from Black, and other land and lumber in Maine, and in their Eastern speculations: and that he often spoke of the plaintiff's having an interest in their purchases, and being engaged in the business of their purchases in Maine. But at the same time, he says, that Burnham did not, as he recollects, state, what interest. or what proportion of interest the plaintiff had with him in any lands, or the precise terms, nature, limits, commencement, duration, or extent of their connection.

The testimony of Dudley Smith, the brother of the plaintiff, is even more general and loose. In relation to the lumber purchase. he says, that on the last of August, or the first of September, 1834. he was present at a conversation, in Gilford (N. H.) between the plaintiff and Burnham. respecting the buying and selling of land in Maine. They spoke of having been in company in that, and selling lumber; and among other things. Burnham asked the plaintiff. if he wished to continue on in company in the lands; and the plaintiff answered. yes. They then agreed, that Burnham should go to Boston and to Maine, on the business, where the plaintiff was to join him, and to pay half the expenses. A few days after, Burnham said to him: We (meaning the plaintiff and Burnham) shall make something on our lumber; but I do not see how your brother (the plaintiff) is going to make out his part of the money? The witness states further, that on the 10th of February, 1835, at Gilford. he was present at another meeting and conversation, between the plaintiff and Burnham; that they spoke of going to the state of Maine together. That afterwards it was concluded that Burnham alone should go. as it was not necessary to go on the land, and that Burnham should take the money. That the witness got $500 from the village bank,

and delivered it to the plaintiff, who handed $400 of it to Burnham, and also gave him a bundle of bank bills, which he said contained $4,000. Burnham received it without counting it. The witness further adds, that the business spoken of in this conversation, as well as on another on the next day, as belonging to their (the plaintiff's and Burnham's) common interest, was the buying and selling of lands in Maine, and disposing of lumber. But he does not remember that Burnham mentioned the precise nature, limits, commencement, duration, or extent of that connection. Taking this testimony altogether, it seems to me far too loose and general in its texture, to establish the case, stated in the bill, of a general copartnership in land and lumber speculations in Maine. There may have been an agreement, that the Babbitt purchase should be made upon joint account, or that the plaintiff should have an interest therein, at his election. But if there was, it does not appear to have been consummated by any joint advance made by him; and, at all events, Smith, the witness, and not Burnham, is the proper accounting party, as Burnham is not proved to have received any money thereout except for his advances. We may then dismiss this transaction from any further consideration.

In the next place, as to the purchase of land from Packard, or rather the bond for a conditional purchase from Packard. As the bond in this case was actually given up, and nothing was ever obtained under it, and no case is made by the bill for any relief touching the same, the only aspect, in which it can become material, is as a link of evidence to establish a particular copartnership in those lands, or an act of purchase under the asserted general copartnership. It is in the latter view, that it is presented in the bill. Does it establish this latter view? In the first place, the bond was taken from Packard in the name of the plaintiff alone; and so far as this fact goes, although the bill asserts the bond to have been taken on joint account, it is written evidence of a sole right, if not contradicting, at least not confirming, the notion of a joint interest. In the next place, the answer expressly denies, that there was any copartnership or joint interest in the bond, or that it was taken on partnership account; and it insists on the contrary, that, although the bond was taken in the name of the plaintiff, yet it was so for the sole account and benefit of the defendant and one John B. Morgan. The reason assigned in the answer for this mode of transacting the business is, that before the making of the bond, it came to the defendant's knowledge, that, in consequence of certain writings between one Asa W. Babcock and the said Packard, Packard could not, as the defendant believed, make the bond to the defendant, without in some way affecting a certain contract for taking timber from the said land, or interfering therewith.

That, on this account, the bond was arranged to be taken in the name of the plaintiff, without his knowledge or authority, for the benefit of the defendant and Morgan. That the plaintiff came to Bangor before the bond was executed, and the circumstances were mentioned to him, and he was told by the defendant, that if he wanted to have any share in the contract he might have it; that the plaintiff made no objection to the bonds being made as aforesaid; and it was so executed, accordingly, and delivered to the defendant. That the plaintiff said he would take a share therein; but did not say what share, nor was it understood or agreed, what share he should have; but that it was never understood or agreed, that the plaintiff and the defendant should have any copartnership interest therein. The answer further denies, that the plaintiff ever gave to the defendant the sum of $2,300, or any other sum to enable him to comply with the conditions of the bond. The answer further avers, that it was agreed between the plaintiff, the defendant, and Packard, that the defendant should give a counter bond or contract to Packard, and the plaintiff; and the defendant accordingly did give such bond or contract to the effect, that the plaintiff and the defendant would take the land at $1.25 per acre, to be paid for at certain given times by instalments, the plaintiff agreeing to take an interest in the lands, if they could be obtained at the price last mentioned, but not as a copartner, as the defendant understood the agreement. The answer then goes on to state, that Packard refused to part with the land at less than $1.50 per acre; and thereupon the contract was rescinded by the consent of the parties, and the bonds mutually given up.

The testimony of Morgan, the other supposed co-contractor, is in the case. He states, that in the autumn, and, as he thinks, in September, 1834, he had a conversation while riding with Burnham, and that in the course of the ride, Burnham spoke freely of the connection in business subsisting between himself and the plaintiff, and informed him that the plaintiff had agreed to furnish $12,000; that the agreement between him and the plaintiff was, "that they should be equally interested in all purchases of land, &c., to be made." Burnham added, that the agreement between the plaintiff and himself was not in writing, and he could work the plaintiff out of it; and that he would take hold of the purchase with him (Morgan), and take one half on his own account alone. He adds, that he was connected in the autumn of 1834 with the plaintiff and Burnham in the purchase of the Packard lands, his interest to be one third, and that of the plaintiff and Burnham to be one third each. Afterwards in the same autumn, the parties all met at Portland, and it was then agreed, that Burnham should go to Packard, and endeavor to purchase the

land of him at $1,25 per acre, if possible, if not, at $1,50 per acre; that the plaintiff should pay to Burnham a sum of money, to be employed in the purchase; and, accordingly, the plaintiff did pay to Burnham, a large package of bank bills, how much, he does not know. Burnham went away, and on his return, stated, that he had not been able to purchase the land of Packard; and that the bonds had been given up. The witness adds, that Burnham's explanation and conduct were not satisfactory to him, or to the plaintiff. The witness further, in his cross-examination, states, that in the course of his ride with Burnham, as above mentioned, Burnham told him, that he and the plaintiff had agreed to be jointly concerned in equal shares in buying land and lumber; that there were no limits to their plans except their means; and that this connexion, between him and the plaintiff, had subsisted somewhat more than a year. In this last statement, the witness must certainly be under a mistake; for the bill itself assigns the connexion or copartnership to have commenced in June, 1834. The witness also adds, that Burnham particularly mentioned, that he and Smith had a joint interest in the land to be purchased of Packard, and in certain other land, which the plaintiff had gone to Hallowell to secure; and that within two years before the time of taking his deposition (which was in June, 1837), Burnham had declared to him, that no one was concerned with him in the purchase of the land from Black, except Colonel Webster; or something to that effect. This is the only evidence, strictly applicable to the Packard purchase. It has been asserted in the argument for the plaintiff, that the money, paid in Morgan's presence was undoubtedly that, for a part of which the second note stated in the bill, dated on the 11th of December, 1834, for $1000, was given as a memorandum. The bill does not (as far as I recollect) contain the same assertion. The terms of the note seem, however, inconsistent with any notion of its being a mere memorandum; for it contains a promise to pay the $1,000 to the plaintiff or order on demand, with interest. Like the other notes in the case, it is negotiable, and on interest, which would seem to show that it was a business transaction between debtor and creditor, and not a mere deposit of money with a partner for partnership purposes. The answer admits that the defendant borrowed $1,000 of the plaintiff on the 11th of December, 1834; and that he gave a note for the same of the same date; but it positively denies that it was any thing but a private loan, and as positively denies that it was received for any copartnership business, or as a part of the capital stock thereof. Morgan states nothing on this point. But his testimony is inconsistent with the bill in one particular; for it states that the purchase of Packard was on the joint account, and for the mutual bene-

fit of the plaintiff and the defendant; whereas, upon Morgan's testimony, he was interested therein to the extent of one third. But the main difficulty remaining in this part of the case is, that Morgan is a single witness against the answer; and whatever may be the scruples of the court in giving entire credit to the statements of the answer as to the Packard purchase, there is no inconsiderable difficulty in giving effect to all the statements in Morgan's testimony, as well from the looseness of some parts as from the want of exact facts in others. If the transaction with Packard, as it is presented to the court upon a full survey of the bill, the answer and the evidence satisfactorily establishes any thing, I cannot admit it to go farther than to show an intended interest of the plaintiff in that particular transaction; but not clearly, of itself, to establish a general copartnership. If a general copartnership were established, aliunde, by the evidence, it would be easy to refer this transaction to that source.

In the next place, as to the purchase from Black, which, after all, constitutes the main hinge of the controversy. In regard to this part of the case, there is much testimony of confessions of Burnham, at different times, to different persons, and in different places, that the plaintiff was jointly interested with him in that purchase, as well as in his Eastern speculations generally, in lands and lumber. Some of this testimony has been already stated; and much of the remaining part is of the same general character, consisting of loose declarations of joint interest and copartnership between Burnham and the plaintiff. I do not pretend to go over the particulars of this testimony, though some of it is abundantly open to comment. The testimony of Clark is clearly not admissible, since he was not examined on the cross-interrogatories. If it were admissible, it seems to me utterly discredited by the contradictions between that and his petition and affidavits, filed in the cause of Clark v. Burnham [Case No. 2.816], in the circuit court in Maine. Perhaps the strongest testimony is that of William M. Kimball to conversations, which he states, that he had with the defendant at several times. First, in January, 1835, at Boston, soon after the purchase of Black, in which he says, that the defendant told him, that he and Frederick Smith had lately purchased several townships in the state of Maine, but he does not remember the number of townships, nor the precise sums paid for them; but it was several hundred thousand dollars; and that the land was in the Bingham purchase. That the defendant added, that he and Smith had purchased together; that they were partners in the purchase; that they both advanced money towards the purchase; and that Smith had not advanced so much as he had expected him to advance. Next he states a conversation with the defendant in Febru-

ary of the same year, at Meredith Bridge, in New Hampshire, in which the defendant said, that he and Smith were connected together in the purchase of the townships in Maine; that Smith had not made out so much money as he expected he would; and he was sorry he had taken him into partnership; that he might have made out all the money for the purchase, and have had all the profits; that Smith would finally make something by the trade, and the witness thinks he said forty or fifty thousand dollars. In the next place, he states a conversation with the defendant, in January, 1836, in Boston, in which the defendant made statements of the same purport as the other conversations respecting Smith's interest. In respect to this testimony, it is open to the remark, that its whole force, so far as the purchase from Black is concerned, depends upon this, whether the conversation related to the lands so purchased, or to other lands in the Bingham purchase. Now, it is expressly stated by other witnesses (Jordan and Stuart), that Smith and the defendant were jointly interested, as they understood from them, in other lands in the Bingham purchase, or at least in township No. 1 in the Bingham purchase. But I do not dwell on these or some other circumstances affecting this testimony, although I cannot but think, that the letters annexed to the bill, which passed between the plaintiff and the defendant, in November, 1835, have a strong tendency to shake the credibility of Kimball's statement as to all the conversations testified to by him, and especially that in January, 1836. These letters show, that as early as the spring of 1835, the plaintiff utterly refused to recognize the rights contended for by the plaintiff, and that there was then a controversy subsisting between them.

If the testimony to the conversations and confessions of Burnham, that the purchase from Black, was made upon joint account, or partnership account, stood alone, it would, from the considerations already suggested, lay open to some doubt and difficulty, owing to the intrinsic infirmity of all such evidence. But it seems to me, that it has to encounter so much opposition, if not contradiction, from other unexceptionable evidence in the case, that a court of equity ought to hesitate a great while, before it should lend entire credence to it, for the purpose of establishing the plaintiff's claim. In the first place, to meet this claim at the threshold, we have the written contract of Black, by which he binds himself to deliver to David Webster and Daniel Burnham, their heirs or assigns, a deed in fee, with warranty, of the lands in controversy. This contract, therefore, being for the purchase of lands, is confined to the immediate parties. Webster and Burnham, without any mention of the plaintiff, or of any other person being interested therein. The presumption therefore is, that no other person had any such interest therein, except Webster and Burnham. How then is the interest of the plaintiff to be made out? It must be by showing, that there is a trust created in his favor in the very lands. Now, this is not attempted to be shown by any written evidence or document. The sole reliance of the plaintiff is, and must be, either, that Burnham and he were, at the time, copartners in business, and that the purchase was made out of the partnership funds; or that the plaintiff actually advanced his own funds on joint account, which were applied to the purchase. Now, the bill does not contain any direct allegation, that the moneys of the copartnership, or of the plaintiff, were actually applied to the purchase from Black. The answer explicitly denies, that any such moneys were applied; and as explicitly denies, that any person, except the defendant and Webster, had any right or title, or interest in the purchase. It is true, that the defendant admits in his answer, that he did apply the $4400, for which he gave to the plaintiff a negotiable note on the seventh of February, 1835, with other moneys of his own towards the purchase. But he positively states, that the $4400 was a mere private loan to himself, and was not so applied as the moneys, either of the plaintiff, or of the supposed copartnership. The note itself on its face supports the answer in this respect; for its terms are just such as ought to exist in the case of a loan, and seem altogether irreconcilable with such a transaction, as the bill asserts, a mere advance to one partner on partnership account. Another striking fact in this part of the case is, that although the purchase money exceeds two hundred thousand dollars; yet there is not a scrip of paper, showing the assent of the plaintiff thereto, or his obligation to pay any part thereof, or his being a co-purchaser with Burnham. Now, certainly, in so large a purchase, it is scarcely credible, that a person of limited means, like Burnham, should take upon himself the whole personal responsibility of paying the whole money without having his partner a party to the contract, or bound to contribute towards the payment, or even without having any proof in writing to show that he was a partner. Suppose the speculation had turned out in the event to be a very losing bargain; what recourse could Burnham have had against the plaintiff? And if the plaintiff had a known fixed copartnership interest, how happens it, that there is no correspondence showing the fact, and calling upon the plaintiff to provide his share of the money? And how happens it, that the plaintiff's name does not appear upon the face of the notes given for the purchase money?

There is another most important portion of testimony, bearing upon this part of the case, which has not been contradicted, or even its credibility doubted. Webster was deeply interested, not only in his own half of the pur-

chase; but also in knowing who were the persons liable for the other half, as the notes included a joint responsibility for the whole purchase money. Now Webster positively states, that the purchase was made on the joint and exclusive account of Burnham and himself; and that he never knew of any other person being interested therein. He further states that when the purchase was about to be made, Burnham offered the plaintiff one half of his proportion, and went on to propose to the plaintiff to become interested, and to join with Webster and himself, or either of them, in the purchase, each taking one third; and that the plaintiff "declined undertaking the purchase either way, observing that it was too great a thing, and that he did not dare to take hold of it." Webster further adds, that the plaintiff was present, when the agreement was finally concluded between Burnham and himself, to make the purchase upon their own exclusive account; and the plaintiff declined to take any interest in the purchase. He then asserts, that the plaintiff "never had, or took any part, share or interest in this contract or purchase." Now, it seems exceedingly difficult to resist the cogency of this testimony. It stands uncontradicted, and comes from a witness deeply interested in, and a party to the purchase, and who had the most complete knowledge of all the preliminary arrangements. What gives it additional weight is, that it stands in entire harmony with all the written documents in the case. They are just such as ought to exist, if the testimony be true; and such as naturally followed from the transaction. And they are just such, as would not ordinarily exist, if the purchase had been made on the joint account of the plaintiff and defendant and Webster. But an additional circumstance, which strikes me as of great weight in this connection is, that if the purchase from Black had been made on the joint account of the plaintiff and the defendant, in the total absence of all written communications and correspondence between them on that subject, either contemporaneous, or subsequent. The purchase was one of great magnitude and responsibility; large sums were to be raised to pay the purchase money; notes were to be given; and yet not a single letter passed between the parties, communicating information, proposing arrangements, or asking advice or assistance respecting it. Such a deep and unbroken silence long continued, does, I confess, lead my mind to distrust the existence of the partnership. It would have a strong tendency to create doubts, even if the testimonial evidence was far more full, and direct, and distinct, than it can be admitted to be. But when it is brought in connection with the other facts of the case, already mentioned, it is impossible not to feel, that it has, and ought to have, much influence in confirming pre-existing doubts, and sharpening other objections.

But, supposing the objections already stated not to be insuperable, we come, in the next place, to the consideration of the important point, whether a parol contract of this sort, for a partnership in speculations in land, to be bought and sold on joint account, is not within the true intent of the statute of frauds. It seems to me, that it must be so considered, both upon principle and authority. There is no substantial difference in the language of the statute of frauds of Massachusetts, New Hampshire, and Maine on this subject; or between them and the English statute of frauds of 29 Car. II. c. 3.[2] The doctrines, therefore, decided upon this point in England, as well as in each of these states, bear directly upon the present case, if not as absolute authorities, at least as containing the opinions of the most enlightened judges upon the language and the intent of the provisions of the statute. I do not perceive that the bill has stated in what state the supposed parol agreement for the copartnership was actually made; and of course the court cannot, strictly speaking, say by what local law it is to be governed. But as, from the allegations in the bill, it may be taken to have been made, either in Massachusetts, or in Maine, or in New Hampshire, it is not of much importance to insist on this defect in the bill, although, perhaps, in strictness, it might be deemed a fatal omission, if properly presented to the court. But as the statutes of frauds in all these states have received, and indeed require the same construction, the objection may well be passed over. Then, in the first place, upon principle, how stands this case? It insists upon a parol copartnership for the purchase and sale of lands for the joint account of the partners. If so, this is clearly the case of a parol contract, respecting an interest in lands. It was contemplated, according to the very structure of the bill itself, that, upon every purchase made under the supposed contract of partnership, the plaintiff should have an interest in the lands purchased, to the extent of one moiety, or his share in the partnership. Now, if the purchase was made in the name of Burnham, as to one moiety, it was to be in trust for the plaintiff. By the statute of frauds all estates made or created by parol, and not put in writing, and signed by the party making or creating the same, are mere estates at will. And all grants and assignments, as well as all declarations or creations of trusts or confidences in lands are also to be manifested and proved by some writing, signed by the party, who is by law enabled to grant, assign, or declare such trust, otherwise the same are utterly void, and of no effect. And all contracts for the sale of lands, or of any interest in or concerning the same, are also re-

---

[2] The clause in the Massachusetts statute of 1783, c. 37, § 3, respecting parol trusts, not resulting trusts, was not incorporated into the Revised Statutes of Maine, in 1821, c. 53. But this omission was cured by enacting it in the statute of Maine of the 14th of February, 1827, c. 358.

quired to be in writing, otherwise no action is maintainable thereon. There is an exception of trusts and confidences, which arise or result by the implication or construction of law, or are to be transferred or extinguished by an act or operation of law.

Now, taking these clauses together, or separately, the same conclusion would seem to follow, as to the parol agreement in the present case. If the agreement could be treated as a sale by the defendant to the plaintiff of any interest in the lands to be purchased, it would be within the statute. If it could be treated as the case of an estate created in lands, it would be a mere estate at will, which would defeat the whole intention of the agreement, and the whole object of the bill. I incline to think, that it properly falls under neither of these predicaments; but that it is the case of the declaration or creation of a trust or confidence in lands, not arising or resulting by implication or operation of law. The trust arises eo instanti upon each purchase, and is then to attach, if at all. If the land is not sold, the plaintiff would still be entitled to his moiety of the land as a trust in equity, just as much as he would be entitled to a moiety of the proceeds upon a subsequent sale. Suppose the defendant should die after any particular purchase, and before the sale, would it not be clear that the trust, if it had any legal existence, would attach in favor of the plaintiff, as to his moiety, just as much against the heirs of the defendant, or persons purchasing under them with notice, as against the defendant himself? Certainly it would. It has been ingeniously argued, that the interest of the plaintiff is in a moiety of the profits, or proceeds of the sale, and not in the land itself; and that, therefore, at least, when the land has been sold by the defendant, the agreement attaches to the moiety of the proceeds. But the agreement, if good at all, attaches also to the land at the time of the purchase; and it is then an agreement for an interest by way of trust in the land, a sort of springing trust; and it is in virtue of this trust estate, and of this only, that any right can attach to the moiety of the proceeds. The right to follow the proceeds is a right which, if it exists at all, flows from the interest in the lands, and the trust created in favor of the plaintiff. It is not collateral; but direct. Indeed, the bill puts the agreement as one of a copartnership for "purchasing and selling lands," by means of a capital to be furnished by the partners, the profits and losses to be equally shared by them. Then, again, it is suggested, that the agreement is not within the statute of frauds, because it did not so much contemplate an interest in the lands purchased, as an interest in the contracts to convey lands obtained by the defendant for the partnership, and the profits made on the sale thereof. But it is a sufficient answer to this suggestion, that such is not the agreement set up in the bill. It is not an agreement to purchase contracts for

the conveyance of lands to be sold for the partnership; but an agreement for the purchase and sale of lands for the partnership. But if the bill had stated the agreement to be, as the argument has supposed, it would not have changed the legal posture of the case. A contract for the conveyance of lands is a contract respecting an interest in lands. It creates an equitable estate in the vendee in the very lands; and makes the vendor a trustee for him. A contract for the sale of an equitable estate in lands, whether it be under a contract for the conveyance by a third person, or otherwise, is clearly a sale of an interest in the lands within the statute of frauds. See Hughes v. Moore, 7 Cranch [11 U. S.] 176, 192–194. A partnership to buy contracts for the sale of lands, is a partnership for the purchase of an equitable interest in those lands. If the transactions are to be carried on by and in the name of one partner, the partnership is to create a trust for the other in those contracts; and consequently, if the agreement for the partnership is by parol, it is to create such trust by parol. This would bring the case within the purview of the statute of frauds. Let us apply this doctrine to the case of the purchase from Black. Webster and the defendant only entered into the written contract with Black for the purchase of the lands. They alone were the parties to it. They alone, at law, have the legal rights growing out of it. How then does the plaintiff make out any title or interest in that contract? It is by setting up a parol trust to the one moiety of the land purchased by the defendant by that contract, under the parol agreement for the partnership; that trust being one of the express terms of that agreement.

Then, it seems clear, that this is not the case of a resulting trust by implication or construction of law. It is not the purchase of an estate by one man in the name of another, where the purchase money is paid by the former, and the deed taken in the name of the latter. It is not the case of a purchase, confessedly paid for out of the funds of an existing partnership, for partnership purposes, and the deed taken in the name of one partner. In each of these cases a resulting trust will arise by operation of law, in favor of the party or parties advancing the money. See Sugd. Vend. (9th Ed.) pp. 134, 135, c. 15, § 2; Dyer v. Dyer, 2 Cox, Ch. 92, 93; 2 Story, Eq. Jur. §§ 1201–1207. Here no partnership funds, as such, existed; and no partnership funds, as such, are shown to have been applied. Lord Hardwicke, in Lloyd v. Spillet, 2 Atk. 150, said, that resulting trusts, or trusts by operation of law, were, first, when an estate is purchased in the name of one person, but the money, or consideration, is given by another; or, secondly, where a trust is declared as to part, and nothing said as to the rest, what remains undisposed of results to the heir at law. And he added he did not know any other instance, besides these two,

where the court had declared resulting trusts by operation of law, unless in cases of fraud, and where transactions have been carried on malâ fide. The trust in the present case, if any there was, was one arising directly ex contractu, and not by implication, or operation of law. I take it to be clear, upon principle, that if one person contracts by parol with another, that he will purchase an estate for the latter, he purchases the estate, and takes the conveyance in his own name, and pays for it out of his own money, and not out of that of the other party, that will not create a trust by implication of law in favor of the other party. The law in such case treats it as a parol contract to purchase and hold in trust for the benefit of another; and not as a trust arising by operation of law. I agree, also, that if trust money is invested in lands, whether rightfully, or tortiously, it may be followed into the land, as a trust created by the operation of law. But then the proof must be clear, that it is trust money which has been so invested. It is the character of the fund, in such a case, that creates and attaches the trust to the land. Lench v. Lench, 10 Ves. 517. Indeed, there is here another difficulty in construing it to be the case of a resulting trust in the lands purchased; for it would defeat the intentions of the parties, as set up in the bill, that the defendant should sell the lands on the joint account. White v. Carpenter, 2 Paige, 241–265; Leman v. Whitley, 4 Russ. 423, 426.

But let us see, how the present case stands, upon authority, as to this objection. Sir Edward Sugden, in the ninth edition of his treatise on the Law of Vendors and Purchasers of Estates (2 Sugd. Vend. 9th Ed., 1834, p. 139), has stated, that "where a man employs another person by parol as an agent to buy an estate, who buys it accordingly, but denies the trust, and no part of the purchase money is paid by the principal, and there is no written agreement, he cannot compel the agent to convey the estate to him, as that would be directly within the statute of frauds." It appears to me, that this is fully borne out by the authorities. It was the very point in Bartlett v. Pickersgill, 4 East, 578, note; s. c. 1 Eden, 515, 1 Cox, Ch. 15. There the defendant bought an estate for the plaintiff; but there was no written agreement between them, and no part of the purchase money was paid by the plaintiff. The defendant articled for the estate in his own name, and refused to convey to the plaintiff, who brought the bill to compel a conveyance. There being no written evidence, that the estate was purchased for the plaintiff, the question was, whether parol evidence was admissible to establish it. Lord Keeper Henley held, that it was not admissible. On that occasion he said: "The question is, whether this evidence be competent or not? That will depend on the statute of frauds. To allow it in this case would be to overturn the statute. The reason for making the stat-

ute was the confusion of property owing to perjury either for money or affection. The statute says, 'No trust shall be of land, unless there be a memorandum in writing, except such trusts as arise by operation of law.' It is not like the case of money paid by one man, and a conveyance taken in the name of another." I am not aware that the doctrine of this case has ever been impugned or shaken. On the contrary, Mr. Chancellor Kent has fully recognized its authority on several occasions, and particularly in Boyd v. McLean, 1 Johns. Ch. 582, 589; Steere v. Steere, 5 Johns. Ch. 1, 19; and Botsford v. Burr, 2 Johns. Ch. 405, 409. In this latter case he acted upon its authority, it constituting one of the main questions in controversy.

There is another case of Atkins v. Rowe, Mos. 133, where some persons, desirous of obtaining a lease of three houses, agreed that one of them should bid for all the houses, but that the lease should be for their joint benefit. Accordingly he bid, and a lease was made to him; and a bill was filed by the others to have the benefit of the lease, and that the purchaser might be decreed to be a trustee. He pleaded the statute of frauds in bar to the discovery and relief. According to Mosley's Reports, the lord chancellor (Lord King), seemed to be of opinion in favor of the plaintiff; and ordered the plea to stand for an answer, with liberty to except, and the benefit of it to be saved to the hearing. Sir Edward Sugden, however, informs us, that the defendant by his answer denied the agreement, and the cause being at issue, several witnesses were examined on both sides. There was a contrariety of evidence; but the plaintiff proved the agreement by one positive witness, corroborated by circumstances. The lord chancellor dismissed the bill with costs; and his decree was affirmed by the house of lords. 2 Sugd. Vend. (9th Ed. 1834) pp. 133, 134.

There is another case (Lamas v. Bayly, 2 Vern. 627), where two persons entered into a treaty for the purchase of an estate, and one of them desisted, and permitted the other to go on with the intended purchase upon a parol agreement, that he should have the part of the estate he desired. The estate was purchased, and then the purchaser refused to comply with the parol agreement, and a bill was brought to enforce it. At the rolls the plaintiff had a decree, partly upon the ground, that the desisting was a part performance; but chiefly upon the ground, that it was a fraud, and like the case, where a man agreed to purchase as agent for another, and would afterwards retain the purchase to himself. Upon an appeal, the lord chancellor (Cowper) reversed the decree, upon the ground, (as the reporter says,) that it was within the statute of frauds. However, I do not rely on this case; because it appears, from Mr. Raithby's note (1) that the decree in the register's book, is, "that his lordship declared, that the circumstances in this case

appeared too slight to ground a decree for performance of the said agreement."

In Rastel v. Hutchinson, 1 Dickens, 44, the bill charged, that the plaintiff had employed the defendant to purchase a house for him, and he accordingly made the purchase in his own name, and took a conveyance to himself, and refused to make a conveyance to the plaintiff; and that in order to prevent the plaintiff from enjoying the premises, he had reconveyed to the grantor, who was also made a party to the bill; and the bill prayed a performance of the purchase. The defendant pleaded the statute of frauds. Upon the plea being argued, it was ordered to stand for an answer, with liberty for the plaintiff to except, and the benefit saved to the hearing. What afterwards became of the case does not appear. The benefit of the plea being reserved to the hearing, is an order too equivocal in its nature to found any absolute opinion upon it.

Then there is the case of Crop v. Norton, 2 Atk. 74, 9 Mod. 233, 235, where Lord Hardwicke is reported to have said, "that where a purchase is made, and the purchase-money is paid by one, and the conveyance is taken in the name of another, there is a resulting trust for the person who paid the consideration. But this is, where the whole consideration moves from such person. But I never knew it, where the consideration moved from several persons, for this would introduce all the mischiefs, which the statute of frauds was intended to prevent." Now, if this language was meant to apply to all joint purchases, where definite proportions of the estate were to be purchased for each party, as one fourth, one third, or one half, each paying his proportion of the purchase-money accordingly, it cannot be maintained; and the doctrine was overturned in Wray v. Steele, 2 Ves. & B. 388, by the vice-chancellor, Sir Thomas Plumer. But if the language was used (as I conceive it was) with reference to the case then before Lord Hardwicke, where there was a mixture of considerations of different natures, and no such definite proportions of the estate to be purchased and held by each party were ascertained, and no definite proportions of the purchase-money to be paid by each were fixed, then, in my judgment, there is great ground to sustain the doctrine. How, under such circumstances, would it be possible to say, what interest or trust in the property each was to take? Surely it would be too much to say, that it was to depend upon the future valuation of the property, or the future contributions made by the parties respectively towards the purchase, or the possible values of the interests in other property contributed by each. In Crop v. Norton, the purchaser surrendered his own interest in the old lease for one life, upon taking the new, and the other party, claiming as purchaser, paid £1,500 towards the renewal for three lives. But no sum was fixed as the agreed value of the old lease for the one life. Lord Hardwicke would not, under such circumstances, allow the parol agreement to control an express declaration of trust by the purchaser. Sir Thomas Plumer, in Wray v. Steele, 2 Ves. & B. 388, 390, has taken the same view of the case of Crop v. Norton, as that above suggested; saying, that the doctrine laid down by Lord Hardwicke must be understood with relation to the case before him, and not generally. That it was a mixed case, the consideration consisting not merely of money, but of the surrender of an old lease; and it was decided on the particular facts. Mr. Chancellor Jones, in his elaborate opinion in White v. Carpenter, 2 Paige, 241, took the same view of the doctrine of Lord Hardwicke, saying: "The grounds of the decision of Lord Hardwicke show, that Lord Eldon was right in saying, that this case was misconceived, when it was cited as an authority for the rule, that a trust could not result from the payment of part of the purchase-money. The principle is, that the whole consideration for the whole estate, or for a moiety, or a third, or some other definite part of the whole, must be paid, to be the foundation of a resulting trust. And that the contribution or payment of a sum of money generally for the estate, when such payment does not constitute the whole consideration, does not raise a trust by operation of law for him, who pays it. And the reason of this distinction obviously is, that neither the entire interest in the whole estate, nor in any given part of it, could result from such a payment to the party, who makes it, without injustice to the grantee, by whom the residue of the consideration is contributed." Upon the rehearing, Mr. Chancellor Walworth seems to have approved the doctrine of Mr. Chancellor Jones on this point. Id. 265. The same doctrine was fully recognised in Sayre v. Townsend, 15 Wend. 647. Now, under one aspect of this case, namely, the doubtfulness of the evidence to establish the proportions of the partners in the asserted partnership, and the extent of the advances made, or to be made, by the plaintiff towards the joint purchases, this doctrine might have had a most important bearing. But I now refer to it for the more direct purpose of showing that mixed purchases of this sort are held to be within the statute of frauds, when there have not been definite proportions and advances made towards the purchase-money by each of the parties interested.

The case of Leman v. Whitley, 4 Russ. & R. 423, is a strong case to show the general doctrine of the court, as to the admission of parol evidence in cases within the statute of frauds. There a son had conveyed to his father, nominally as a purchaser, but really as a trustee, that the father, who was in better credit than the son, might raise money on the estate by way of mortgage for the use of the son. The father died before the money was raised by mortgage. Upon a bill

brought by the son for a reconveyance, it was held that the case fell within the statute of frauds. and that parol evidence was inadmissible to establish the trust.

The case of Groves v. Groves, 3 Young & J. 163. shows how reluctant the court is to create any trust upon mere confessions, even confessions that the purchase-money had been paid by a third person.

The case of Forsyth v. Clark, 3 Wend. 637, establishes the doctrine, that, if a purchase is made of lands by one partner, it will not create a resulting trust thereon in favor of the partnership, even if the partnership funds have been appropriated to the purpose, unless the appropriation has been in pursuance of an agreement of the partners at the time of the purchase. If there be no funds of the partnership. as such, to be appropriated to the purpose, it would seem, a fortiori, that no such resulting trust could arise. The same point was decided in Hoxie v. Carr [Case No. 6,802].

Some cases have been cited on the other side. the most material of which I shall proceed to mention. Of these the most striking is Lees v. Nuttall. 1 Russ. & M. 53; s. c.. 1 Tam. 282. There the defendant. an attorney, had been employed to purchase an equity of redemption of a mortgaged estate for his client, the plaintiff, and the attorney had purchased it in his own name. and insisted upon holding it in his own right. But the master of the rolls (Sir John Leach) held him to be a trustee for his client, and decreed a conveyance to be made to the client upon the payment of the purchase-money. The ground of the decision was, that the subsisting relation between the plaintiff and the defendant, as principal and agent. or client and attorney, disabled the defendant from holding the purchase for his own use. Now, that case is distinguishable from the present in the important fact, that the present purchase was made by the defendant, not as a mere agent. but as a principal in interest. and properly in his own name. If, in that case. the attorney had been authorized to purchase in his own name. in trust for his principal, that would have given rise to the very question now before the court. Then the case of Hess v. Fox, 10 Wend. 436. There a parol agreement was made between the mortgagor and mortgagee of an estate, that the mortgagor should convey an absolute title to the mortgagee. in order that the latter might sell the estate. and that, after discharging his own debt. the mortgagee should pay over the surplus to the mortgagor. The court held the case not to be within the statute of frauds. There, the legal title to the estate was vested in the mortgagee. The sale was executed and surplus money was claimed under the agreement. as the consideration for parting with the title. Now, there was here a plain resulting trust to the mortgagor. upon the conveyance of the equity of redemption. for he had received no consideration therefor. The sale of the equity was then a sale for his use. Then, the case of Bunnel v. Taintor's Adm'r, 4 Conn. 568. That was a case, where there was a parol agreement of the plaintiff and the intestate, to buy and sell lands on joint account. The plaintiff was to make the bargain for the purchasers, and to render all necessary services; the intestate was to furnish the purchase-money, and take the deeds in his own name, and execute the deeds or sales; and the profits were to be divided between them. After the death of the intestate, this action was brought for an account of the profits against the administrator. The case went off upon other points; but it was the opinion of a majority of the court, that the agreement was not "upon any contract for the sale of lands, tenements, or hereditaments, or any interest in or concerning them. within the statute of frauds of Connecticut"; though it was thought to be a mere point of speculation, not necessary to be decided in the case. Now the point in the present case is not, whether the contract was a sale of lands, or any interest therein. within the statute of frauds; but whether it is the case of a trust in lands, or the proceeds thereof. within the statute of frauds. This case, therefore, may be dismissed from our consideration, as it did not turn upon the point now in controversy. As to the case of Griffith v. Young, 12 East, 513, it is sufficient to say, that in that case the money had been expressly received by the defendant from a third person, to pay over to the plaintiff upon a consideration executed. But Lord Ellenborough said, that if the contract had been executory, it would have been within the statute of frauds. There is a case (Pitts v. Waugh, 4 Mass. 424), which seems to me also to approach nearly to the point of this very question. It was there decided, that the law merchant respecting dormant partners does not extend to partnerships formed for speculations in the purchase and sale of lands; that when lands are sold, no man as a dormant partner can claim any part of the lands by virtue of any conveyance. to which he is not. on the face of it, a party; and that, if the nominal purchaser choose to hold the lands, the party. who has advanced the money. if not named as grantee, can have no title to the land (at law). whatever remedy he may have against him. to whom the land was conveyed (in equity). The court were also of opinion, that a purchase and sale of that sort. by such a partnership, was within the statute of frauds.

These are all the most direct authorities, on which it seems important to comment. It seems to me, that they leave the case of Bartlett v. Pickersgill. 4 East. 577. note: s. c.. 1 Eden, 515; s. c., 1 Cox. Ch. 15.—in full force unimpeached and unimpeachable. The true result to be deduced from the authorities seems to me to be, that in the first place the present cannot be deemed the case of a resulting trust in the lands purchased of Black,

or of the proceeds thereof, or in any other lands to be purchased on behalf of the asserted partnership; and, in the next place, that the whole title of the plaintiff resolves itself into a parol trust, created by an express agreement of the parties in the purchase and sale of lands on joint account, which is within the statute of frauds. It seems to me, that to admit the plaintiff to recover in this case, would break down the whole operation and policy of the statute of frauds in regard to trusts. I find, too, that the same view of the matter has been taken by Sir Edward Sugden, a most truly respectable authority upon such a subject, in the last edition of his treatise on Vendors and Purchasers.

Upon the whole, my opinion is, that the bill ought to be dismissed; but, under all the circumstances, without costs to either party.