[Filed December 1, 1890.]

## JAMES FLOWER *v.* F. BARNEKOFF.

PARTNERSHIP TO SPECULATE IN REAL ESTATE—STATUTE OF FRAUDS.—A valid contract of partnership for the purpose of speculation in real estate may be made by parol.

ID.—EXECUTED PAROL AGREEMENT—PARTNER ESTOPPED TO DENY VALIDITY.—In a suit by one of the partners for an accounting of the profits realized under such an agreement, after the same has been executed, a partner who has received the entire profits is estopped from claiming that the agreement is void under the statute of frauds.

ID.—WHEN IT EXISTS IN RELATION TO LAND PURCHASES.—Where two persons agree jointly to secure an option on a tract of land for the purpose of jointly selling the land and sharing in the profits of the transaction, they are partners as between themselves for that transaction and owe to each other the rights and duties of that relation although the option may be taken in the name of one of the parties.

CASE IN JUDGMENT.—Evidence examined and held to constitute a partnership.

Yamhill county : R. P. BOISE, Judge.

Plaintiff appeals.  Reversed.

This is a suit in equity for a dissolution of a partnership and for an accounting.  The complaint alleges that the contract of partnership was entered into between the plaintiff James Flower and the defendant F. Barnekoff on March 10, 1889, and that it had for its object the purchase on partnership account of an option upon certain lands of one H. A. Tucker, lying and adjacent to the town of McMinnville, Yamhill county, Oregon.  The purpose of the partnership so formed was, as soon as the privilege had been secured, to plat the land as an addition to McMinnville and to put it upon the market in the shape of town lots and blocks.  Each partner was to pay half of all expenses, and, upon the property being sold, was to receive half of what was left of the proceeds after providing for the purchase price to be paid Tucker.  It was understood and agreed at the time the partnership was formed that Flower should have the special and exclusive charge of that part of the firm business which related to the platting of the land and putting it on the market.  In pursuance to this partnership, and as a member of the firm, Barnekoff succeeded in getting a sixty-days' option from Tucker on March 14, 1889, for which he paid him $100 cash, the purchase price agreed upon being $150 an acre.  This option Barnekoff took into his own name,

but for and in behalf of the firm. Barnekoff reported to Flower what he had done, and Flower approved of it, and then and there agreed to stand his half of the loss in the event of their not being able to turn over the purchase within sixty days, to which agreement Barnekoff then and there became a party. The plaintiff at once set to work to carry out his part of the partnership, and before May 1, 1889, had secured a purchaser for the entire tract, able, willing and ready to buy the same at an agreed price of $200 per acre. On that day Barnekoff, taking advantage of the fact that the option stood in his own name, sold the land to the Investment Company of Portland for $18,022, which was at the rate of $200 per acre, without the knowledge or consent of Flower and in fraud of his rights under the partnership agreement. Barnekoff now refuses to account with Flower for the profits thus made, viz.: $4,505.50.

The answer denies each and every allegation of the complaint except that the defendant secured the Tucker option in his own name and that he sold the land to the investment company at a profit of $4,505.50.

The case was sent to a referee to take testimony; and upon the coming in of his report, a decree was entered dismissing plaintiff's complaint, from which this appeal is taken.

*Milton W. Smith*, and *Walter S. Perry*, for Appellant.

The relations of the parties as shown by the testimony constituted a partnership. (*Berthold* v. *Goldsmith*, 24 How. 536; *Strader* v. *White*, 2 Neb. 348, 350; 3 Kent Com. note *b*; *In re Francis*, 2 Sawy. 286; *Cogswell* v. *Wilson*, 11 Or. 371; *Morse* v. *Richmond*, 97 Ill. 303; 1 Bates, Partnership, 18.)

The agreement relied upon by plaintiff is not within the statute of frauds. (*Knott* v. *Knott*, 6 Or. 142; *Chester* v. *Dickerson*, 54 N. Y. 1, 7–8, 13 Am. Rep. 550; *Traphagen* v. *Burt*, 67 N. Y. 30, 33; *King* v. *Barnes*, 109 N. Y. 267, 285; *Smith* v. *Tarlton*, 2 Barb. Ch. 336; *Richards* v. *Grinnell*, 63 Iowa, 44, 50 Am. Rep. 727; *Treat* v. *Hiles*, 68 Wis. 344, 60 Am. Rep. 858; *Morrill* v. *Colehour*, 82 Ill. 618; *Wallace* v. *Carpenter*, 85 Ill. 590; *Holmes* v. *McCray*, 51 Ind. 358, 19 Am. Rep. 735; *Newell*

v. *Cochran*, 41 Minn. 374; *Black* v. *Black*, 15 Ga. 449; *Welland* v. *Huber*, 8 Nev. 203; *Coward* v. *Clanton*, 79 Cal. 23, 26; *Hunter* v. *Whitehead*, 42 Mo. 524; *Hirbour* v. *Reeding*, 3 Mont. 15; *Morley* v. *Ennis*, 2 Colo. 300; *Meagher* v. *Reed*, 14 Colo. 335; Browne's Statute of Frauds, § 260, *et seq.*)

The controlling question is, were they partners? If they were, the fact that Flower's promise to reimburse Barnekoff was subsequent to the purchase of the option, cuts no figure. (*Wormser* v. *Meyer*, 54 How. Pr. 189; *Bopp* v. *Fox*, 63 Ill. 540; *Southern White Lead Co.* v. *Haas*, 73 Iowa, 399; *Gray* v. *Palmer*, 9 Cal. 616; *Newell* v. *Cochran*, 41 Minn. 374; *Palmer* v. *Tyler*, 15 Minn. (Gil. ed.) 106; *Wood* v. *Cullen*, 13 Minn. (Gil. ed.) 395; *Cunningham* v. *Littlefield*, 1 Edw. Ch. 104; *Canada* v. *Barksdale*, 76 Va. 899; *Brinkley* v. *Haskins*, 48 Tex. 225; *Russell* v. *Green*, 10 Conn. 269; *Fisher* v. *Sweet*, 67 Cal. 228; *Yeoman* v. *Lasley*, 40 Ohio St. 190; *Hulett* v. *Fairbanks*, *Id.* 233; *In re Warren*, 2 Ware (Dav.), 320; 1 Bates, Partnership, § 86.)

There can be no question, we take it, that there may be a partnership for a single transaction, and that that transaction may have to do exclusively with land. (*Kelley* v. *Bourne*, 15 Or. 476; *Clagett* v. *Kilbourne*, 1 Black, 346; *Thompson* v. *Bowman*, 6 Wall. 316; *Sage* v. *Sherman*, 2 N. Y. 417.)

Should this court be of the opinion that the contract in this case was not one of partnership, but that it was one for a purchase and sale on joint account, as individuals, we claim that the case is that of an *implied* trust. (*Nixon's Appeal*, 13 P. F. S. (63 Pa. St.) 279; *Dryden* v. *Hanway*, 31 Md. 254, 100 Am. Dec. 61; *Wallace* v. *Carpenter*, 85 Ill. 590; *Boyd* v. *McLean*, 1 Johns. Ch. 582.)

Again, should the court construe the contract in proof as neither a partnership nor a joint venture, but as an agency, the law is clear that the statute of frauds has no application. (*Trowbridge* v. *Wetherbee*, 11 Allen, 361; *Wetherbee* v. *Potter*, 99 Mass. 354; *Hess* v. *Fox*, 10 Wend. 437; *Coleman* v. *Eyre*, 45 N. Y. 38; *Miller* v. *Kendig*, 55 Iowa, 174; *Carr* v. *Leavitt*, 54 Mich. 540; *Linscott* v. *McIntire*, 15 Me. 201, 33 Am. Dec.

602; *Bunnel* v. *Taintor*, 4 Conn. 568; *Bruce* v. *Hastings*, 41 Vt. 380, 98 Am. Dec. 592; *Snyder* v. *Wolford*, 33 Minn. 175, 53 Am. Rep. 22.)

Our prayer including general relief, and the main object of the suit being an account, we submit that Mr. Flower is entitled to that account under any phase of the proof—partner, agent or joint owner. (*Seymour* v. *Freer*, 8 Wal. 202; *Brower* v. *Brower*, 29 Fed. Rep. 485; *Miller* v. *Lord*, 11 Pick. 11; 1 Story, Eq. Jur. §§ 27–8, 31–2, 437, 439; 1 Pomeroy, Eq. Jur. §§ 239, 241–2; 1 Daniell, Ch. Pl. and Prac· 381 *et seq.*)

*W. D. & F. W. Fenton,* for Respondent.

The testimony does not establish the fact of partnership. Even if there was an agreement for a partnership, it was merely executory. But the plaintiff's testimony, at best, simply tends to prove a proposition that the plaintiff and defendant should become joint owners or tenants in common in this contract or land—not partners. (1 Collyer's Law of Partnership, § 3, note, p. 12; 1 Collyer's Law of Partnership, § 18, note 4; *Hopkins* v. *Forsythe*, 14 Pa. St. 34, 53 Am. Dec. 513; 1 Bates on Partnership, § 78; 1 Lindley on Partnership, 32, note 15; *Groves* v. *Tallman*, 8 Nev. 178.)

There was no consideration for the alleged agreement of partnership. It was clearly *nudum pactum*. (1 Bates on Partnership, § 2; *Mitchell* v. *O'Neale*, 4 Nev. 504; 1 Lindley on Partnership, 81–82, note 1; *Frothingham* v. *Seymour*, 118 Mass. 489.)

The remedy of plaintiff is not in equity, but at law. (*Hill* v. *Palmer*, 56 Wis. 123, 43 Am. Rep. 703; *Treat* v. *Hiles*, 68 Wis. 344; *Brosnau* v. *McKee*, 63 Mich. 454; *Raub* v. *Smith*, 61 Mich. 543, 1 Am. St. Rep. 619; *Doyle et al.* v. *Bailey et al.* 75 Ill. 418; 5 Gilman, 402.)

If there was an agreement for a partnership, it was oral, and never having been executed or in part performed, and being to buy a particular tract of land and sell again, contemplated that plaintiff should procure a distinct and certain interest in real estate, and the same was therefore void under the statute of frauds. (1 Bates on Partnership, 301–302;

4 Lindley on Partnership, 101; *Green* v. *Drummond*, 31 Md. 79; *Kayser* v. *Maugham*, 8 Colo. 239; *Van Trotha* v. *Bamberger*, 15 Colo. 1.)

All the authorities agree that a contract like the one described in this case is void. (1 Warvelle on Vendors, 183; *Rawdon* v. *Dodge*, 40 Mich. 697; *Levy* v. *Brush*, 45 N. Y. 589; *Brosnau* v. *McKee*, 63 Mich. 454; *Raub* v. *Smith*, 61 Mich. 543; 1 Am. St. Rep. 619; *Wright* v. *DeGroff*, 14 Mich. 163; *Scott* v. *Bush*, 29 Mich. 523; *Erben* v. *Lorillard*, 19 N. Y. 299; *Smith* v. *Burnham*, 3 Sumner, 435 (U. S. Cir.); *Bailey et al.* v. *Hemenway et al.* 147 Mass. 328; *Parsons* v. *Phelan*, 134 Mass. 109; *Bird* v. *Morrison et al.* 12 Wis. 172, Leading Case; *Dunphy* v. *Ryan*, 116 U. S. 491; *Allen* v. *Richard*, 83 Mo. 59; *McCormick's Appeal*, 57 Pa. St. 54, 98 Am. Dec. 191.)

BEAN, J.— It is contended by respondent at the outset of this case that the agreement of the parties, if a contract of partnership, being for a partnership to deal in real estate, is void under the statute of frauds, because not in writing. This question has been much discussed by the courts, and there is considerable conflict in the adjudged cases. On the one hand, it is claimed that a parol agreement for a partnership to deal in lands would be within the statute which provides that "no estate or interest in real property * * * can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing, subscribed by the party creating, transferring, or declaring the same." (1 Hill's Code, § 781.) And to this effect is the case of *Smith* v. *Burnham*, 3 Sumn. 435. On the other hand, there are many authorities which hold that such an agreement is not within the statute, for the reason that the real estate is treated in equity as personal property for all purposes of partnership. (*Dale* v. *Hamilton*, 5 Hare, 369; *Essex* v. *Essex*, 20 Beavan, 449; *Chester* v. *Dickerson*, 54 N. Y. 1, 13 Am. St. Rep. 550.) The question is ably and exhaustively examined in *Dale* v. *Hamilton*, and the conclusions reached by the vice chancellor in that case seem to us to be supported both by reason and authority. The general doctrine is there laid

down that "a partnership agreement between A & B that they should be jointly interested in a speculation for buying, improving for sale and selling lands, may be proved without being evidenced by a writing signed by or by the authority of the party to be charged therewith within the statutes of frauds, and such an agreement being proved, A or B may establish his interest in land, the subject of the partnership, without such interest being evidenced by any writing." In *Chester* v. *Dickerson* it is said: "Most of the conflict in the authorities has arisen in controversies about the title to the real estate after the dissolution of the partnership or the death of one of the partners. But suppose two persons by parol agreement enter into a partnership to speculate in lands, how do they come in conflict with the statute of frauds? No estate or interest in lands has been granted, assigned or declared. When the agreement is made, no lands are owned by the firm and neither party attempts to convey or assign any to the other. The contract is a valid one, and in pursuance of this agreement they go on and buy, improve and sell lands. While they are doing this, do they not act as partners and bear a partnership relation to each other? Within the meaning of the statute, in such case, neither conveys or assigns any land to the other, and hence there is no conflict with the statute. The statute is not so broad as to prevent proof by parol of an interest in lands; it is simply aimed at the creation of conveyances of an estate in lands without a writing."

In *Knott* v. *Knott*, 6 Or. 146, WATSON, J., in discussing this question, says: "While there is a conflict in the authorities, many of the courts have followed the decision in *Smith* v. *Burnham*. We regard the doctrine laid down in *Dale* v. *Hamilton* as better adapted to the course of business in this country, where mercantile, manufacturing and various other partnerships are necessarily compelled in the course of their business, the investment of their capital and the collection of debts due them, to become the owners of real property.' While the case just referred to was not a partnership formed

for the purpose of dealing in real estate, the decision shows the tendency of this court to follow *Dale* v. *Hamilton* rather than *Smith* v. *Burnham.*

From a careful examination of the authorities, we are of the opinion that a valid contract of partnership for the purpose of speculating in real estate may be made by parol. (*Traphagen* v. *Burt,* 67 N. Y. 30; *King* v. *Barnes,* 109 N. Y. 267; *Richards* v. *Grinnell,* 63 Iowa, 44, 50 Am. Rep. 727; *Treat* v. *Hiles,* 68 Wis. 344, 60 Am. Rep. 858; *Wallace* v. *Carpenter,* 85 Ill. 590; *Holmes* v. *McCray,* 51 Ind. 358, 19 Am. Rep. 735; *Newell* v. *Cochran,* 41 Minn. 347; *Black* v. *Black,* 15 Ga. 445; *Coward* v. *Clanton,* 79 Cal. 23; *Meagher* v. *Reed,* 14 Colo. 335.) Many of the cases above cited go much further than is necessary for us to go in this case in order to admit the proof of the formation of the partnership here. The contract does not in any way affect the title to real estate, nor does the present controversy involve any such question. The subject matter of the contract was the profits to be realized from the sale of the Tucker land, and the controversy here is as to such profits. The contract of purchase from Tucker was not secured to hold as land or with any intention of ultimately vesting the legal title in the partnership, but for the purpose of sale and the acquisition of profits. It was secured simply as an article of commerce and for speculation. No controversy exists here about the title to any land taken or owned by the partners, but it simply relates to the conduct of the defendant while he was acting as a partner; and in such a case the statute of frauds certainly cannot be invoked to defeat this suit. The object of the alleged partnership has been accomplished, and this suit is for the purpose of adjusting the accounts between the parties. This is a matter over which a court of equity has jurisdiction, and the defendant cannot, after the contract has been executed, and the profits of the transaction gone into his hands, be heard to say that the contract, under which the profits were realized, is void under the statute of frauds. (*Coward* v. *Clanton,* 79 Cal. 23; *Morrill* v. *Colehour,* 82 Ill. 619; *Chester* v. *Dickerson,* 54 N. Y. 1.)

The next question presents. more difficulty and relates to the allegations of partnership set up in the complaint and denied in the answer. The defendant Barnekoff resides at McMinnville and is engaged in the milling business, while the plaintiff is a real-estate dealer in Portland. About the first of March, 1890, defendant, desiring to purchase some land for use in his business, applied to one H. A. Tucker, who owned a tract of land containing ninety acres adjoining defendant's mill property with that object in view; but Tucker refused to divide his land or sell any portion without selling the entire tract. The defendant then called upon plaintiff, with whom he had had previous dealings, for the purpose of obtaining his assistance in securing a purchaser for the Tucker land. What took place between the parties is thus related by plaintiff: "In Mr. Barnekoff's visits to our office he had several times mentioned the fact of a tract of land abutting on the town adjoining his mill property that he thought could be secured. After conver. sation and consultation with him, we concluded we could handle the property, the price being satisfactory in our view. It was mutually agreed that we would secure a contract on the land, consisting of ninety acres. The matter was all talked over and fully understood before any proceedings were taken towards securing the land. First, it was suggested to procure a contract on the land on the most favor able terms possible, a small payment to be made to secure the land in lieu of a bond for a deed.   *   *   *   It was agreed that the contract should be taken in the name of F. Barnekoff so as to create no suspicion of a movement in or around McMinnville; Mr. Barnekoff assuring me that he would stand a better chance of getting the contract in his name than by using the name of a non-resident, as he had had previous business transactions with Mr. Tucker in lands. *   *   *   The agreement was that a contract should be secured on this land for as small a sum as possible;   *   *   * that the entire handling of the property after securing such a contract would be left with myself. The profits, if any,

arising from the handling were to be divided share and
share alike, and the losses, if any, in the same proportion.
This was with Barnekoff and myself.   *   *   *   On March
14th, Mr. Barnekoff did secure a contract on this identical
piece of property by paying the sum of $100 to secure the
same.   The contract was duly drawn in legal shape.   On
the 16th of the same month Mr. Barnekoff called at my
office and produced the contract.   I read it over and saw it
was legally drawn, but said to him I see you have paid
$100; don't you think you have paid a good deal of money
for so short a time on this land?   He said it was the very
best he could do.   I then told him that while the time was
short, I felt perfectly satisfied in being able to handle the
land as agreed upon, and that if it was not handled in the
specified time, I would reimburse him one-half of the $100,
and it was agreed on.   He left the contract with me; I had
it in my possession for four or five days; proceeded to
McMinnville on the 17th; examined the land carefully, and
with him figured exactly how we should handle it.   After a
careful examination, I surrendered the contract to him and
returned to Portland."

The witness then narrates what he did in trying to secure
a buyer for the land, and finally, as he claims, by consent
and agreement of defendant, contracted to sell the land to
Mr. Markle for $200 per acre; but before the sale was con-
summated, the defendant sold the property to other parties
for $200 per acre and refused to recognize either plaintiff or
Markle's right or interest in the matter.

R. S. Howard, a witness for plaintiff, who was present at
the conversation between plaintiff and defendant concerning
this land, says:   "My recollection is that probably the con-
versations began in February or March.   *   *   *   There
was a proposition to buy a piece of land adjoining McMinn-
ville, some ninety acres, more or less.   Mr. Flower, my part-
ner, insisted on going in with Mr. Barnekoff and buying
this tract of land jointly, near McMinnville, and having it
platted into lots and sold.   Was present when Barnekoff

came down with the contract. He remarked that he had secured a contract on the land—my recollection is at $150 per acre—for sixty or ninety days; * * * and he and Flower talked it over here that they could place the land at a profit, even before platting; * * * that they could probably sell the land without platting it; but in case that was not done, * * * we were as real-estate agents, Howard & Flower, to assist in placing the property—in selling it. Flower said, 'if we do not succeed in placing it I will give you my half of it back' (the $100). My understanding was that Flower was an equal partner with Mr. Barnekoff in the profits of the transaction."

Mr. Geo. B. Markle, to whom plaintiff had negotiated a sale of this property, and who, after being informed that defendant refused to consent to his purchase, but had sold the land to other parties, went to McMinnville in company with plaintiff to see defendant about the matter, testifies that after he and plaintiff arrived at McMinnville and found that defendant would not let him have the property, "a discussion arose then between Mr. Barnekoff and Mr. Flower as to their working together. As to the partnership, Mr. Flower asked Mr. Barnekoff if he had not agreed with him—if he did not tell him in the first place how to secure this land, and afterwards, when Mr. Barnekoff did secure it and pay some down, or agree to, whether he did not agree to reimburse him for half of the amount if the sale did not go through. At first Mr. Barnckoff said there was some talk about that, but he afterwards admitted that that was the case. There was the question put to him by Mr. Flower: 'Are we not partners in this deal?' Mr. Barnekoff admitted that they were partners in the deal."

Mr. Barnekoff, the defendant, after testifying that he paid $100 to Tucker on this contract for the land, and that he was not a partner with Flower in any transaction whatever, gave his version of the matter as follows: "Well, the first I thought of this land, I needed some more for my mill. I bought my mill ground from the same party, H. A. Tucker

He told me that I could not have any land without buying the whole; so the next time I went down I went into Mr. Flower's office and told him there was a piece of land up there, and the man did not want to sell it except to sell as a whole, and if he could get a buyer for it I wished he would. He asked me the price of the land, and I told him that H. A. Tucker wanted $150 an acre. He said, 'well, I cannot get a buyer without we have some contract for it.' Well, I told him that probably I could get a contract from H. A. Tucker. 'Well,' he says, 'if you can secure a contract, why get it, and then we will see what we can do towards handling the land and getting a buyer for it.' After I got the agreement I went down and told Mr. Flower that I had got a contract for it, and if he would get a buyer I would like him to get one. Well, he said he would try and see if he could get one. That was all the talk we had that day. The next time I came down he made a proposition to me, and insisted on it, that he would like to go in with me, and we should buy the land. I told him right then and there that I had no money to buy land with; that I had all my money invested in my mill, and that I could not go in on that agreement. 'Well,' he says, 'then I will try and get a buyer and — how would it be, supposing we got $200 an acre for it; supposing I get a buyer and you take a share in it.' I told him that I had no money to put into land at all; that I would not handle the land on any consideration; that I had the land sold for the reason that I wanted a piece of land for my mill. That was all there was said about it at that time, and he said he was going to try to get a buyer for the land in some shape or other. I went in repeatedly to ask if he had secured a buyer yet for that land." "Q. Upon what terms was he to secure a buyer?" "A. He was going to — I asked him if his commission was going to be the same as on the mill, and he said, 'yes; without you agree to take up the proposition I made.' I did not conclude any arrangement with Flower at $200 per acre or at any other price. I did not give him the exclusive right to find a

buyer for this land, but I reserved the right to place the land for my own benefit while he was trying to find a buyer."

The witness then gives his version of the Markle transaction and of his disposal of the land to the investment company for $200 per acre. Says that Flower never agreed to repay him one-half of the $100 paid to Tucker in case the land was not sold; there never was any definite interest agreed upon between him and Flower in case the land was sold; took the contract from Tucker in his own name and for his benefit alone; nothing was ever mentioned about the partnership. The witness also denied the admission testified to by Markle.

The foregoing is substantially all the testimony in this case material to be considered, and the question is, does it prove a partnership between plaintiff and defendant in this transaction concerning the Tucker land?

A partnership is usually defined to be a voluntary contract between two or more competent persons to place their money, effects, labor and skill or some or all of them in lawful commerce or business, with the understanding that there shall be communion of the profits and losses thereof between them. (Story on Part. § 2; 3 Kent, 23.) Partnership and community of interest, independently considered, are not always the same thing, nor is a mere community of interest sufficient, but there must be an agreement to share the profits and losses, and such profits must be shared as the result of the adventure or enterprise, in which both are interested and not simply as a measure of compensation. ( Cogswell v. Wilson, 11 Or. 379.) More briefly, a partnership has been defined to be "a contract in which two or more persons agree to put in something in common with the view of dividing the benefits which result from it." (Strader v. White, 2 Neb. 362.) There may be a general partnership at large, or it may be limited to a particular branch of business, or to one particular subject, as where the parties have united to share the benefits of a single transaction (3 Kent. 30), and may exist in the purchase and dealing in lands.

(*Kelley* v. *Bourne*, 15 Or. 476.)   The intention of the parties
in forming a particular relation governs in determining
whether they are partners or not.   Where the facts are
given, this question is one of law, and the intention of the
parties will be determined from the effect of the whole con-
tract regardless of special expressions (1 Bates on Part. §
117); the declaration of the parties, if not inconsistent with
the other terms of the contract of course controlling.   A
community of profit and loss in the adventure or business
in which the parties are engaged is usually considered a
test of a partnership; and an agreement to share in the pro-
fit and loss of a business shows an intention to create a
partnership unless such intention is controlled by the stipu-
lation of the parties or inferred from conduct inconsistent
therewith.   (L. Bates on Part. § 25.)   Where it appears that
there is a community of interest in the capital stock and
also a community of interest in the profit and loss, then it
is clear, and actual partnership exists between the parties.
(*Berthold* v. *Goldsmith*, 24 How. 536.)   Profits may be, and
in fact often are, received as mere compensation in case of
service or special agency where the employe has no interest
in the business or power as a member of the firm and no
interest in the profits, as such, but is employed as a servant,
special agent or broker, and is to receive a given proportion
of the profits as compensation for his services.   In such case
the receipt of profits does not constitute a partnership.   (1
Bates on Part. § 43; *Berthold* v. *Goldsmith*, 24 How. 536.
*Ogden* v. *Astor*, 4 Sandf. 311.)   This distinction is recognized
by repeated decisions of the courts; and while cases arise on
one side or the other of the line approaching in their facts
so near to each other that the difference between them may
appear to be unsubstantial, yet the distinction itself is
recognized, and the only difficulty is in the application of
the principle on which it rests.

That a partnership may be formed to deal in land has
already been held by this court in *Kelly* v. *Bourne*, 15 Or.
476, and it would seem that if two or more persons agree

jointly to buy a tract of land for the purpose of jointly selling it and sharing in the profits of the transaction, they are ordinarily considered partners as between themselves for that transaction and owe to each other the rights and duties of that relation. (*Yeoman* v. *Lasley,* 40 Ohio St. 190; *Hulett* v. *Fairbanks, Id.* 233; *Morse* v. *Richmond,* 97 Ill. 303; *Canada* v. *Barksdale,* 76 Va. 899; *Clagett* v. *Kilbourne,* 1 Black. 346; *Dale* v. *Hamilton,* 5 Hare, 368.)

Without commenting on the evidence in this case, we are of the opinion that the preponderance of the testimony is with the plaintiff; and while the case comes very close to the line between a partnership and a co-ownership, we think the facts show such a community of interest in the subject matter of the contract and the profit and loss of the enterprise as to constitute a partnership. But whether the agreement constituted a partnership in a technical legal sense or a co-ownership is thought to be immaterial in this suit. The rights and liabilities of the parties rest upon their agreement, and are now to be enforced upon the principles applicable to partnership transaction. (*King* v. *Barnes,* 109 N. Y. 267; *Hockett* v. *Multnomah Ry. Co.* 12 Or. 124.) The avowed object of defendant in consulting plaintiff about the matter was to obtain his skill and experience in securing a purchaser for the land. The option was secured at plaintiff's suggestion and under his advice. It was submitted to him for examination and approval after it was secured. He proceeded in good faith with defendant's approval to secure a buyer for this land, evidently believing that he was to share in the profits if a sale could be made. Defendant was present and participated in the negotiations with Markle, and at his suggestion a date was fixed for the examination of the land by Markle with the understanding that if it was found as represented Markle would take it at two hundred dollars an acre. But before the time fixed for the examination of the land by Markle had arrived, defendant disposed of it at a profit of $4,505.50, and now refuses to account to plaintiff for any portion of such profit. It is true, defendant claims that

XX OR.—10.

plaintiff was acting as a mere agent for him in the matter, and so testifies. This claim depends upon his own unsupported testimony, which is contradicted not only by plaintiff but the witnesses Howard and Markle as well as the circumstances and action of the parties themselves. The defendant, no doubt, testifies to what he understands and believes to be a correct state of the facts, and the same may be said of the other witnesses in the case. In such conflict of the testimony, it is not only a delicate but difficult matter to adjust the conflicting statements so as to arrive at the true facts. Approximation is all that can be expected,。and we must determine the question in accordance with the weight of the evidence as we understand it. The acts performed by plaintiff, and the interested part he took in the matter, strongly rebut any presumption that he was a mere agent to dispose of this land for defendant and to receive a commission for so doing; and in the absence of convincing proof that he was such agent, leaves no alternative but to conclude that his claim is correct and that he was to share in the profit to be derived from the sale of this land. The conduct of the defendant is, we think, inconsistent with the idea that he was the principal, and plaintiff his agent. He allowed plaintiff to handle this property under the belief that he was to share in the profits if a sale could be made, at no time intimating that he claimed the sole ownership of the option. He participated in the negotiations with Markle, and in so doing gave Markle to understand that he and plaintiff were jointly interested in the matter as partners. Not until a sale was about to be made to Markle do we hear of defendant claiming a sole ownership in the option. Then, for the first time it would seem he conceived the idea of selling this land and appropriating the entire proceeds to his own use, never even offering to compensate plaintiff for the services rendered by him. It is true, the Tucker option was taken in defendant's name, but if our view of the testimony is correct, it was so taken in pursuance of the contract of partnership and was for the benefit of the firm. Defendant can claim no advantage

by reason of that fact.   The defendant contends that if there
was an agreement for a partnership it was never executed
and there was no valid consideration to support it.   In this
view we are unable to concur.   The contention is that even
if defendant entered into a contract of partnership, the
business of the firm never was launched; nothing was done
in furtherance of it, nothing was earned or lost by it; the
defendant has simply violated his contract and plaintiff's
remedy is at law.   The business of the partnership was to
secure an option on the Tucker land, and if possible dispose
of the land at a profit.   This business was entered upon and
prosecuted until it was accomplished and the land disposed
of, and not until that time did defendant intimate that he
would not comply with his agreement.   The business of the
firm was fully completed before defendant undertook to
violate his contract, and then only in refusing to account to
plaintiff for the profits of the enterprise.   Under such circum-
stances it is difficult to conceive how the contract can be an
executory one.   A sufficient consideration is afforded by the
fact that the parties mutually promised to share the losses,
if any, and to share equally in the profits of the contemplated
enterprise.   The profits realized by defendant from a sale of
the Tucker land are admitted to have been $4,505.50.

It therefore follows that the decree of the court below must
be reversed and a decree entered here in favor of plaintiff
for the sum of $2,252.75 and the costs and disbursements in
this court and the court below.