Argued January 22, decided February 11, 1913.

## BALL *v.* DANTON.

(129 Pac. 1032.)

### Fraudulent Conveyances—Preferences—Validity.

1. A creditor may secure himself or collect his debt from the debtor to the exclusion of other creditors.

### Partnership—Existence of Relation.

2. Persons engaged in buying, selling, and improving real estate, sharing in the profits and losses, are partners.

### Partnership—Firm and Individual Creditors—Rights.

3. Firm debts must be paid out of firm property before any part thereof may be applied to the debts of individual partners, and a creditor of a partner has no right to any more of the firm property than the actual interest of the partner therein.

### Partnership—Settlement of Firm Affairs—Rights of Partners.

4. A partner may settle the firm affairs by buying the interest of his copartner in order to escape litigation over a claim about to be brought against the latter, and the transfer may not be attacked as in fraud of creditors of the copartner.

### Partnership—Confidential Relations—Fraud—Evidence.

5. Evidence held not to show that a conveyance by a debtor to a brother in settlement of their rights as partners in a business was in fraud of a creditor of the debtor.

### Fraudulent Conveyances—Knowledge and Intent of Grantee—Statutory Provisions.

6. Section 7401, L. O. L., providing that the provisions of the chapter relating to fraudulent conveyances, declaring in Sections 7397 and 7400 that every conveyance, made with intent to defraud creditors, shall be void, shall not affect the title of a purchaser for a valuable consideration, unless he had notice of the fraudulent intent of his grantor, is a statutory rule of equity; and, to invalidate a conveyance to a purchaser for valuable consideration, it must appear that he had prior notice of the fraudulent intent of the grantor.

### Fraudulent Conveyances—Knowledge and Intent of Grantee—Evidence.

7. The fact that a purchaser had actual notice of the intent of his grantor to defraud his creditors, essential to invalidate

the conveyance at the suit of a creditor, may be proved by circumstantial evidence.

**Fraudulent Conveyances—Knowledge and Intent of Grantee— Evidence—Presumptions.**

8. Equity will not presume that a conveyance is fraudulent as against the creditors of the grantor, where the transaction is clearly susceptible of good faith and fair dealing.

**Evidence—Conspiracy—Declarations of Conspirators—Admissibility.**

9. Declarations of persons engaged in a conspiracy, made prior to its consummation, are binding on all of the conspirators; but, after the conspiracy is accomplished, a declaration of one of them is binding on him alone.

**Evidence—Hearsay Evidence.**

10. Where, in a suit by a judgment creditor to set aside a conveyance of the debtor as fraudulent, the debtor is made a party defendant, the default or confession of the debtor is hearsay as against the grantee.

**Fraudulent Conveyances—Evidence of Fraud—Inadequacy of Consideration.**

11. Gross inadequacy of price is a circumstance to show fraud in the conveyance as against the creditors of the grantor; but inadequacy alone is insufficient to invalidate a conveyance made in good faith for a valuable consideration.

**Fraudulent Conveyances—Inadequacy of Consideration—Effect.**

12. Section 7401, L. O. L., providing that the provisions of the chapter making conveyances in fraud of creditors void shall not affect the title of a purchaser for a valuable consideration, unless he had prior notice of the fraud of his grantor, does not make adequacy of consideration essential to sustain a conveyance; and, where the grantee shows good faith and a valuable consideration, he need not show affirmatively that the consideration was adequate.

**Pleading—Nature and Purpose.**

13. In equity, as at law, the office of a pleading is to inform defendant of plaintiff's cause of suit or defendant's grounds of defense.

**Fraudulent Conveyances—Issues, Proof, and Variance.**

14. Under Sections 725, 726, L. O. L., providing that the evidence shall correspond with the substance of the allegations

and be relevant to the questions in dispute, the court, in a suit by a judgment creditor to set aside a conveyance by the debtor as fraudulent, on the ground that the conveyance was without consideration, may not set aside the conveyance subject to payment to the grantee of the consideration actually paid by him, on proof that the grantee paid a substantial sum for the property, and such relief is applicable only where the creditor calls for an accounting and decree subjecting the property to the payment of his debt after payment of the sum paid by the grantee.

**Fraudulent Conveyances—Knowledge and Intent of Grantee—Evidence—Sufficiency.**

15. Evidence held not to show that a grantee, paying a valuable consideration for the conveyance, had prior notice of the intent of the grantor to defraud his creditors.

From Multnomah: HENRY E. McGINN, Judge.

Statement by MR. JUSTICE BURNETT.

The plaintiff in his own right, and as assignee of other claims, recovered a judgment against the defendant A. Lane for $2,800, which, being unsatisfied, he brought this suit against the judgment debtor and Jennie Lane, his wife, Frank Lane and May Lane, his wife, and R. C. Danton to set aside certain conveyances of realty made by A. Lane to Danton and Frank Lane. The property deeded to Danton was two lots in Vernon, a suburb of the City of Portland, said to be about 2½ miles from the Willamette River, together with 160 acres of timber land in Jackson County, about 40 miles from the railroad, and 2 miles distant from the nearest highway. That passing to Frank Lane consisted of an undivided half of the N. E. ¼ of section 30 in township 3 south, range 5 east, of Willamette meridian, in Clackamas County, and a like estate in eight lots in different suburbs of the City of Portland. Besides alleging that the defendant A. Lane is wholly insolvent, and that there is no property, other than that mentioned, out of which the plaintiff's judgment could be satisfied, the complaint alleges:

"That said conveyances from said defendants A. Lane and Jennie Lane to said defendant R. C. Danton, and

each thereof, were voluntary and without consideration, and were made in trust for the defendant A. Lane, with the understanding and agreement by and between the said defendants A. Lane and Jennie Lane and defendant R. C. Danton that the said defendant R. C. Danton should hold the title to said premises in trust for the sole use and benefit of defendant A. Lane; that said conveyances from defendants A. Lane and Jennie Lane to defendant R. C. Danton, and each thereof, were made with the intent on the part of the said defendants A. Lane and Jennie Lane and R. C. Danton to hinder, delay, and defraud the creditors of said defendant A. Lane, including this plaintiff, of their lawful debts and demands; that said defendant R. C. Danton, at the time of said conveyance had full knowledge of such intent of said defendants A. Lane and Jennie Lane to so hinder, delay, and defraud the creditors of said defendant, and that said defendant R. C. Danton, at the time of said conveyances, had full knowledge that defendant A. Lane had conveyed said premises to defendant Jennie Lane with the intent on the part of said A. Lane and Jennie Lane to hinder, delay, and defraud the creditors of defendant A. Lane."

Practically identical allegations are made concerning the conveyance from A. Lane to Frank Lane.

The answers traversed the allegations of the complaint in all material particulars affecting the defendants. Danton averred that he paid to A. Lane and Jennie Lane, the owners of the property, on the 9th day of November, 1910, $500 for the two lots in Vernon, then incumbered by mortgage of $3,000, which he agreed to assume and pay as a part of the purchase price thereof, and that he paid $1,500 for the land in Jackson County; both payments being in cash. He alleges that he had no notice of the matters and things alleged in this complaint wherein fraud is charged against the defendants, and that he purchased the property in good faith, without any knowledge of the claim of any other person thereto, or the claim of any fraudulent transaction of the parties connected with the title. Similar allegations are made

in the answer of Frank Lane; and, in addition thereto, he goes into detail in stating what he paid for each lot and parcel of land mentioned in the complaint. Besides this, he avers that he and the defendant A. Lane were, in effect, partners in the buying and selling of real property; and, in relation to the lands in dispute, that he (Frank Lane) had advanced all of the purchase price, except $250, and all the money for the improvements on this property, except what was borrowed by them jointly and secured by mortgages on the several lots.

The reply traverses the new matter in the answers. We find in the record that the defendant A. Lane, by his attorney, accepted service of a motion for entry of his default, but made no answer, and a decree was entered against him *pro confesso.* The circuit court, after hearing the evidence of the parties, entered a decree, in substance, upholding the deed from A. Lane to his brother Frank, and setting aside the grant to the defendant Danton. Both the plaintiff and the defendant Danton appeal.

                                                MODIFIED.

For appellant R. C. Danton there was a brief over the name of *Mr. Cicero M. Idleman,* with an oral argument by *Mr. Guy C. H. Corliss.*

For respondent, W. F. Ball, there was a brief over the names of *Messrs. Farrington & Farrington* and *Mr. C. M. White,* with an oral argument by *Mr. White.*

For the other respondents there was a brief over the names of *Mr. J. F. Sedgwick* and *Mr. Charles W. Fulton,* with an oral argument by *Mr. Sedgwick.*

MR. JUSTICE BURNETT delivered the opinion of the court.

As to the defendant Frank Lane, it appears from the testimony that he and his elder brother A. Lane were engaged together in buying and selling real property, taking joint title to that purchased. The property was

mainly in lots in the outlaying suburbs of Portland. In one instance, A. Lane paid $50, and Frank Lane $450, of the purchase price of $500 for a single lot. In another case, each paid one-half of the purchase price of $400. No other payments were made by A. Lane on any of the property purchased by the two brothers in common. The procedure apparently in each case was to buy a lot and mortgage it for money with which to aid in the construction of a dwelling and other improvements thereon. Besides this, in each instance, Frank Lane advanced considerable amounts from his own means, none of which was ever repaid by the elder Lane. In addition to all of this, from time to time Frank Lane had loaned his brother A. Lane different sums of money, amounting, at the time of the settlement between them, to $1,217.65.

The plaintiff, Ball, and the defendant A. Lane are brothers-in-law, having married sisters. It appears in evidence that Ball and other parties were owners of certain tracts of land in Eastern Oregon, and had secured A. Lane to obtain a purchaser for that realty. The landowners alleged that A. Lane secured purchasers for each tract at $1,600, which he collected, and paid them only $1,000 each. Six of them assigned their claims against Lane to Ball, who commenced an action against A. Lane, resulting in the judgment already mentioned. About the time the action was commenced, Frank Lane, hearing of the impending litigation, and being apprehensive that he would be involved in some way to his prejudice, sought A. Lane and demanded settlement of their partnership affairs and payment of the debt due from his brother to himself. It appears that A. Lane scouted the idea that anything could be recovered from him by the plantiff Ball or his assignors, and refused to settle any of the affairs between himself and Frank Lane; but the latter insisted, and finally, after much persistence on his part, effected an adjustment discharging the debt of $1,217.65, and

dissolving the partnership relations existing between them, and paid him $750 in cash, receiving the conveyance attacked in this suit. Frank Lane claims that the $750 covered what cash had been actually advanced by the defendant A. Lane in the purchase of the property, together with $500 for his interests in the possible profits in their realty venture. Frank Lane very candidly states that he knew about the pending litigation between Ball and his brother A. Lane, and urged settlement with his brother because he feared to be involved in the matter to his own prejudice. He stoutly denies that he took the property with intent to defraud any creditors, but solely for his own protection, and without any agreement or understanding that A. Lane should have any subsequent interest or benefit in the property. Considerable effort, by opinion evidence, was made on the part of the plaintiff to show that the property conveyed to Frank Lane by A. Lane was much greater in value than the price allowed for the same in the settlement. This was combated by Frank Lane with other evidence putting the prices lower, and by his own testimony, given in detail, of what was actually invested in each particular piece of property, including the improvements.

In respect to the property claimed by Danton, it appears that about the time the action of Ball against Lane was commenced, or soon afterwards, the defendant A. Lane conveyed to his wife the west half of the two lots in Vernon; it being their residence property. That action was pending several months; and, shortly before it was brought to trial, A. Lane represented to Danton that he (A. Lane) was in need of money, and, wishing to realize quickly, offered to sell him the timber land in Jackson County and the two lots in Vernon, which were subject to a mortgage of $3,000, as before stated. According to Danton's testimony, Lane represented to him that the timber land in Jackson County was 40 miles

from a railroad, the last 2 miles of which distance had
to be traveled without a trail, and that the timber was
not large or first class, by any means. They dickered
several days about the price to be paid; the owner first
demanding $3,000 and Danton holding aloof. They
finally settled upon $2,000; and the undisputed testimony
of Danton and another witness, whose deposition is in
evidence, shows that Danton paid A. Lane that amount
in actual gold coin, and took the conveyance in dispute
here.

. As before stated, the decree against A. Lane went by
default, and, as appears in testimony, he left the State,
and his whereabouts was unknown during the pendency
of this suit. There is no testimony in the record tending
to show that Danton knew anything about the litigation
between Ball and A. Lane, or that the latter had divested
himself of his other property. No witness appears who
testifies to any one ever having said anything to Danton
about the pendency of the litigation between Ball and
A. Lane. This distinguishes the present case from that
of *Philbrick* v. *O'Connor,* 15 Or. 15 (13 Pac. 612: 3 Am.
St. Rep. 139), where the fact that the action was pending
and the circumstances upon which the subsequent judg-
ment was obtained were noised abroad throughout the
city, and discussed with the defendant in the family with
whom he boarded, thus imparting to him actual notice.
On the other hand, Danton testifies that he knew nothing
whatever of the troubles between Ball and A. Lane, and
that he paid the sum of $2,000 in coin from his own
money, in good faith, without any notice whatever of any
wrongful or fraudulent intent on the part of A. Lane.
It does not appear that either of the parties consulted
an attorney, or that Danton had the title examined, or the
land in Jackson County inspected by any one. He testi-
fies that he was more or less familiar with the lots in
Vernon, having visited at the house of A. Lane several

times. Danton had for many years been a barber, earning good wages, and was a preceptor in an institution teaching that trade. He had speculated some in real estate, and claimed to have drawn the $2,000 in question from $2,400 in coin which he had in the vault of a safe deposit company in Portland. He admitted that, while he had this deposit on hand, he was paying interest at the rate of 7 per cent per annum on $2,600, which was secured by a mortgage on his family home. He explains, with a tolerable degree of accuracy, the sources from which he accumulated the $2,400 from which he paid for the property in question. As in the matter of the lands conveyed to Frank Lane, several witnesses were called to give their opinion about the value of the property conveyed by A. Lane to Danton, and, as usual in such cases, a great variety of opinion was expressed; one witness placing the two lots in Vernon at the value of $6,000, and others putting it as low as $3,500. One of these testifying to a high estimate had assigned to Ball one of the claims going to make up the latter's unsatisfied judgment. Only one witness spoke who knew anything about the timber land in Jackson County. In his direct examination, he appraised it at $4,000, but on cross-examination reduced it to half that sum, which he said he himself would be unwilling to give. There is no testimony whatever that A. Lane reserved any interest to himself in either of the transactions with Danton or with his brother Frank Lane, and both the grantees deny that any such reservation was ever made in either parcel of property.

1. As to the defendant Frank Lane, it is admitted that a creditor may secure himself or collect his pay from his debtor, even to the exclusion of other creditors. This principle has been well settled in this State. *Jolly* v. *Kyle,* 27 Or. 101 (39 Pac. 999) ; *Sabin* v. *Columbia Fuel Co.,* 25 Or. 15 (34 Pac. 692: 35 Pac. 854: 42 Am. St. Rep.

756) ; *Mendenhall* v. *Elwert,* 36 Or. 384 (52 Pac. 22: 59 Pac. 805) ; *Currie* v. *Bowman,* 25 Or. 382 (35 Pac. 848). This principle is conceded by plaintiff; but he urges that the vigilant creditor has no right, as against other creditors, to take more property than will fairly satisfy his claim against the common debtor, and that if he does, or so pays the difference in money, with knowledge of the common debtor's purpose to hinder, delay, or defraud others, the transaction is utterly void.

It will be noticed, in passing, that, in the case of *Garnier* v. *Wheeler,* 40 Or. 198 (66 Pac. 812), this court upheld a transaction between two brothers, where the creditor brother bought property from the debtor brother, setting off, as a part of the purchase price, a debt due from the one to the other, and paying the difference in cash; the court basing its decision on the general fairness of the transaction and the adequacy of the price, although the defendant was unable to account within $700 of how he paid the purchase price. If the debt from A. Lane to Frank Lane was the only element of the transaction between them, we might consistently apply the principle contended for by the plaintiff, and hold that the transaction was fraudulent by reason of Frank having paid to A. Lane the difference of $750 in cash. This, however, is not all of the matter involved.

2. Engaged, as they were, together in buying and selling real estate and improving the same, they were partners within the meaning and intent of *Flower* v. *Barnekoff,* 20 Or. 132 (25 Pac. 370: 11 L. R. A. 149). Ball, as a creditor of A. Lane, one of the individuals of this partnership, had no right to any more of the partnership property than the actual interest of A. Lane therein.

3. It is a well-settled principle of law that the partnership debts must be first paid out of the property of the concern; and, if anything is left for the individual partners, individual creditors may claim the same, but

Sig.   7

not otherwise. As a creditor of A. Lane, Frank Lane had a right, by diligence and foresight, to secure the payment of his debt, if he could, in advance and to exclusion of the other creditors.

4. With like sagacity and prudence he had the right to wind up and settle the partnership existing between them, so as to extricate himself from what promised to be embarrassing litigation with respect to the claims against his partner. In short, in the matter of winding up the partnership affairs, he had a right to buy his peace with his partner for a given sum of money, and the transaction cannot be assailed if it was done fairly and legally.

5. When we remember that the undisputed testimony is that all the money which A. Lane invested in the partnership affairs was $250, that the only interest he had, besides that, was the prospect of an undivided one-half of the possible profits, and that all the property involved was subject to sundry mortgages, which they had placed upon it for the purpose of raising money for improvement thereof, we are not prepared to say that the transaction between the two brothers was fraudulent or designed to hinder, delay, or defraud creditors of the defendant A. Lane. It is fairly apparent that the partnership between the two brothers, and the indebtedness of one to the other, could not have been adjusted in any other way; and we think the court decided rightly in upholding the conveyance to Frank Lane.

6. In respect to the defendant Danton, we observe that by Section 7379, L. O. L., every conveyance of any estate or interest in lands made with the intent to hinder, delay, or defraud creditors of their lawful suits or demands, as against the person so hindered, delayed, or defrauded, shall be void. The ensuing sections here quoted also appear in the same chapter:

"Sec. 7400. The question of fraudulent intent in all cases arising under the provisions of this statute shall be deemed a question of fact and not of law."

"Sec. 7401.   The provisions of this chapter shall not be construed in any manner to affect or impair the title of a purchaser for a valuable consideration unless it shall appear that such purchaser had previous notice of the fraudulent intent of the immediate grantor or of the fraud rendering void the title of such grantor."

This last section is a statutory rule of equity in this State, and much has been written, and many authorities have been cited, without due regard to its particular terms.   Many of these precedents are from states having enactments on the subject couched in other terms.   The rule which our Code establishes is that the provisions of the chapter shall not be construed in any manner to affect or impair the title of a purchaser for a valuable consideration.   The exception is that, if it shall be made to appear that the purchaser had previous notice of the fraudulent intent of the grantor, the rule shall not apply.   In *Garnier* v. *Wheeler,* 40 Or. 198 (66 Pac. 812), Mr. Justice MOORE, upholding a conveyance from one brother to another, which was alleged to be in fraud' of creditors of the grantor, quotes with approval the language of Wait on Fraudulent Conveyances as follows:

"Three things must concur to protect the title of the purchaser: (1) He must buy without notice of the bad intent on part of the vendor; (2) he must be a purchaser for a valuable consideration; (3) he must have paid the purchase money before he had notice of the fraud."

Out of the mouths of two witnesses, uncontradicted in any respect, it is established that Danton paid to A. Lane $2,000 at the time of the delivery of the conveyances from the latter to the former.

A crucial question of the case is to determine whether or not Danton is within the exception to the rule laid down in Section 7401; that is to say, whether it appears that he had previous notice of the alleged fraudulent intent of his grantor.   In the early case of *Coolidge* v. *Heneky,* 11 Or. 327 (8 Pac. 281), it is held that notice of the fraudulent intent of the grantor must be actual.

7. In later cases, like *Lyons* v. *Leahy,* 15 Or. 10 (13 Pac. 643: 3 Am. St. Rep. 133), the court holds that while notice must be actual, yet it may be proven by circumstantial evidence. In *Raymond* v. *Flavel,* 27 Or. 219, 240, 241, 246 (40 Pac. 158, 164, 166), Mr. Justice WOLVERTON, in discussing the question, says:

"We have decided in a late case (*Bowman* v. *Metzger,* 27 Or. 23 (39 Pac. 3: 44 Pac. 1090), wherein it was sought to charge the purchaser of a promissory note before due with notice of its infirmities in the title, that the question for the determination of the jury was whether Bowman purchased in good or bad faith, and that it was error for the court to instruct the jury that notice of the facts and circumstances that a prudent man would take notice of and inquire about, and which, if followed up, would disclose the truth, was equivalent to notice. The principle is applicable here. Circumstances which one man might look upon with suspicion, and which might cause him to make a careful inquiry, might escape the notice of another person of equal prudence and caution, so that the incidental question of common prudence is not a safe criterion by which to determine the question of notice. It might be, and often is, a circumstance tending to show bad faith, as fraud or guilty knowledge may be imputed either by direct proof or evidence of a circumstantial nature, the same as any other fact; but the real and ultimate question for determination is the *mala fides* of the transaction. * * The notice must be more than would excite the suspicion of a cautious and wary person. It must be so clear and undoubted, with respect to the existence of a prior right, as to make it fraudulent in him afterwards to take and hold the property"—citing *Hall* v. *Livingston,* 3 Del. Ch. 348.

8. Another rule applicable to the matters under consideration is laid down by Mr. Justice WATSON in the case of *Hurford* v. *Harned,* 6 Or. 362, 365, to this effect:

"That a court of equity will never presume a fraud when the transaction under investigation is equally susceptible of two explanations, one of which is consistent with a fraudulent intent, and the other with good

faith and fair dealing. In such cases, that construction of the acts of the parties which is consistent with good faith and fair dealing will be preferred."

The same principle is laid down in *Sabin* v. *Columbia Fuel Co.*, 25 Or. 15 (34 Pac. 692: 35 Pac. 854: 42 Am. St. Rep. 756).

Counsel for the plaintiff laid much stress upon the fact that Danton paid $2,000 in coin, which he claimed to have taken from the safe deposit vault; that at the same time he was paying interest at 7 per cent on a mortgage for $2,600 on his home; that he bought the land without having an abstract prepared, and without examining the timber land; that he and A. Lane were personal friends; that the latter had defaulted in answering, and had not been called to testify. These were pressed upon our attention at the hearing, and the Socratic peroration of counsel was an argument aptly stated and very persuasive. All of these, however, are susceptible of an explanation consistent with good faith. It is permissible for a man to keep his coin in a safety deposit vault, and many people of undoubted wealth pursue that practice. The memory of the money panic in a time of plenty in 1907, with its consequent nonjudicial days by executive appointment, was yet green. Danton, as a speculator in real estate, could with all propriety mortgage his homestead and keep the money, where a series of suddenly proclamed holidays, when banks close, would not prevent him from using it to secure an advantageous bargain. Men often do legitimate business on borrowed capital. Knowing, as he did, that the two lots were subject to a $3,000 mortgage, Danton had a right to presume that the title had been examined by one taking them as security, and that search on his part would be superfluous. That A. Lane was not called as a witness is explained by other testimony, which clearly shows that he had left the State and his whereabouts was

unknown. His making default does not in the judgment of the writer affect Danton one way or another. True enough, as to the defendant A. Lane, his failure to answer was a confession by him of the truth of the allegations of the complaint as against him, but him only. If the theory of the complaint is true, Danton and A. Lane conspired together to hinder, delay, and defraud the plaintiff, Ball.

9. Conceding the conspiracy, the declarations of those engaged in it made, prior to its consummation, would bind all of them; but after the conspiracy is accomplished, and the criminal partnership is at an end, the subsequent confession of one of them, Lane's default in this instance, can only bind the one making it, and as to the other one constitutes *res inter alios acta.*

10. Indeed, according to many precedents, A. Lane was not a proper party to this suit for, if he retained any interest in the land, that interest was bound by the lien of the unsatisfied judgment against him, while if he had parted with the whole estate, as his deed indicates, he was like any other stranger whose default or confession would be pure hearsay. The language of Mr. Justice STRAHAN as to the defaulting defendant in *Philbrick* v. *O'Connor,* 15 Or. 15 (13 Pac. 612: 3 Am. St. Rep. 139), is not at variance with the rule laid down here.

As to the timber land, it was of doubtful value; and being far remote from the city of Portland, where he lived, Danton had a right to rely upon the representations of his friend, A. Lane, about its quality and condition. Speculating in a small way in real estate, as the evidence shows Danton was at the time, he might well consider that his friend was in need of money and willing to sacrifice his property, as men often do to discharge honest debts; that here was a chance to buy real property on speculation; and that it was a question of taking the current while it served, or losing the venture. It may be

that his friendship for Lane made him an easy mark
for the latter's craftiness. It is easy to look back now,
when we have all the facts before us, and found, upon
A. Lane's actions, the presumption that he intended to
defraud his creditors, although no direct proof is offered
on the subject. From the standpoint of Danton at the
time, with the information he possessed, we have only
a case of a man, with some money on hand, meeting an
opportunity to buy property advantageously, upon which
he took the chance of any other speculator. It is quite
as legitimate to say that A. Lane was bent on swindling
Danton by getting $2,000 away from him, under such
ostensible circumstances as would leave him loser at the
suit of A. Lane's brother-in-law creditor, as to hold that
Danton invested his money to help Lane swindle Bell.
To defeat the deed would be to found a presumption of
Danton's fraud upon the presumption of unfair dealing
on the part of A. Lane. In other words, we must infer
from circumstances that A. Lane committed fraud in
selling his property to Danton, and, based upon the pre-
sumption, further infer that Danton was likewise guilty.
Section 796, L. O. L.

11. We are not unmindful of the rule that gross inad-
equacy of price is a circumstance tending to show fraud
in a transaction as against creditors. No case, however,
is cited where that element alone is sufficient to over-
throw a conveyance otherwise made in good faith for a
valuable consideration. In *Philbrick* v. *O'Connor,* 15 Or.
15 (13 Pac. 612: 3 Am. St. Rep. 139), the defendant paid
$1,800 for property worth nearly three times that much;
but he had actual notice of the very litigation which it
was designed to defeat on execution by means of the
sale. In *Weber* v. *Rothchild,* 15 Or. 385 (15 Pac. 650:
3 Am. St. Rep. 162), the property was valued at $8,000
or $9,000, and sold for $2,500; but the grantor took an
instrument of defeasance for his own benefit, and the

whole transaction was clearly shown to be confessedly an effort to defeat alimony in a threatened divorce case against the grantor. In *Conn. Mutual Life Ins. Co.* v. *Smith*, 117 Mo. 261 (22 S. W. 623: 38 Am. St. Rep. 656), the defendant paid $100 for $15,000 worth of property, besides occupying, at the time, a fiduciary relation as to the grantor, which he used to her disadvantage. Many other cases are cited by the plaintiff; but they are all based upon dealings among near relatives, where either no consideration or merely a nominal one passed between the parties. On the other hand, in *Brown* v. *Case*, 41 Or. 221 (69 Pac. 43), this court, speaking by Mr. Justice MOORE, held that property worth $11,000, for which the sister of the grantor paid in cash only $7,500, and agreed to take care of the grantor during his life, was fairly conveyed, and that the inadequacy of consideration was not so great as to shock the conscience of the court and render the deed void as to creditors.

Finally, it was urged upon us in the brief and at the argument that the consideration must be adequate; and, although the grantee shows good faith and a valuable consideration, the burden is still upon him to show affirmatively that the consideration paid was adequate, so that, if he failed to establish the latter element, the transfer will be set aside, subject to the payment to the grantee of the consideration actually advanced by him. There are two reasons against this solution of the case.

12. The rule established by Section 7401, L. O. L., says nothing whatever about adequacy of consideration; but, on the contrary, it states that the provisions of the chapter shall not be construed in any manner to affect or impair the title of a purchaser for a valuable consideration. Adequacy is not made an element of the rule. Again, we recall that the plaintiff lays his case on the allegation that the conveyances from Lane to Danton were voluntary and without consideration, and were

made in trust for the former with the understanding and agreement, by and between the two, that Danton should hold the title in trust for the sole use and benefit of Lane. As we have seen, the testimony is clear and convincing that Danton paid $2,000 in gold coin for the property in dispute. This entirely exonerates the transaction from the charge of the complaint that it was "voluntary and without consideration." There is no intimation in the testimony whatever, on either side, that the transfer of the property was made in trust for the defendant A. Lane; neither is there any showing whatever that there was any agreement between Lane and Danton that the latter should hold the property in trust for the benefit of the former. On the contrary, the only testimony in the case is directly opposed to this charge found in the complaint.

13. In equity, as in law, the office of a pleading is to inform the opposite party of the plaintiff's cause of suit or the defendant's grounds of defense.

14. It is also a rule in equity, as in law, that the evidence "shall correspond with the substance of the material allegations, and be relevant to the questions in dispute." Sections 725, 726, L. O. L. The relief suggested would be applicable to the case in hand, if the plaintiff had manifested a willingness to do equity as well as to seek it, alleged the circumstances attending the conveyance and the payment by the defendants of their money, and called for an accounting and decree subjecting the property to the payment of his debt, after the liquidation of the amounts advanced by the defendants. On the other hand, plaintiff charges fraud and knowledge of the same upon all parties, and wants all the property, without regard to the rights or interests of others, the defendants. To grant him relief when he has utterly failed to prove his case, as he states it, would be for the court to do equity for him when he was unwilling to do it for himself.

As against the defendants, it would be to make for them a contract which they never contemplated. In other words, it would be to change what they contracted to be a sale of property into a mortgage. There are several cases in the reports of this court where property has been subjected as to a prior lien for money advanced by defendant, and the plaintiff has been allowed to take the residue; but this is not such a case. It is not a proceeding in bankruptcy. If the complaint is true, the defendants actively and knowingly participated in the deceit and wrongdoing of the defendant A. Lane, and should have no consideration whatever from a court of equity. If, in the language of the statute already quoted, they were purchasers for a valuable consideration, they are entitled to hold the property thus acquired, unless it shall appear that they had previous notice of the intent of their grantor.

15. Irrespective of where the burden lies, the testimony, in our judgment, is not sufficient to bring the defendants within the exception of the statute showing them to have had previous notice of the fraudulent intent of the grantor, when we apply the rules of construction in favor of good faith, to which we have already called attention in the precedents established by this court. It may be that the circumstances thrust upon our attention would excite suspicion of a cautious and wary person, when strongly actuated by self-interest; but, to an impartial observer, they do not amount to the clear and undoubted proof which is necessary under the doctrine of *Raymond* v. *Flavel,* 27 Or. 219, 240, 241, 246 (40 Pac. 158, 164, 166), to establish the existence of fraud on the part of the answering defendants. Equity will go far and do much to uncover concealed property, and subject it to the owner's debts; but it will not issue a search warrant on suspicion.

In our judgment there is no halfway ground in this case. The plaintiff is entitled to all or nothing. As we have seen, however, he has failed to establish the allegations of his complaint in very essential particulars. Hence his bill must be dismissed. The decree will be modified accordingly.                                MODIFIED.